PEOPLE v WHITE

Docket No. 57728. Argued January 4, 1977 (Calendar No. 1).—Decided
    October 11, 1977.

    Adoise White was convicted in 1962 by a jury in Oakland Circuit
    Court, William John Beer, J., of first-degree murder. The Court
    of Appeals, Danhof, P. J., and T. M. Burns and Van Valken-
    burg, JJ., reversed and remanded for a new trial on an insanity
    issue (Docket No. 11728). 40 Mich App 433; 198 NW2d 904
    (1972). The defendant was convicted of first-degree murder in
    the second trial and the Court of Appeals, V. J. Brennan, P. J.,
    and D. E. Holbrook and M. F. Cavanagh, JJ., affirmed (Docket
    No. 20202). Defendant appeals, raising several issues. He as-
    serts that two things were the result of involuntary confessions:
    testimony by a police officer that while he was in custody he
    led the police to physical evidence of the crime, and a television
    newsfilm in which he confessed the crime to a television
    newsman which the trial court held could be used to impeach
    him if he testified. He chose not to testify. He further asserts
    error in allowing the people to impeach the testimony of an
    accomplice who, on the second trial, claimed that he was
    unable to remember the crime. The accomplice's testimony
    from the first trial was read to the jury, and they were shown a
    filmed interview in which the accomplice admitted participa-
    tion in the crime to the television newsman. Defendant also

REFERENCES FOR POINTS IN HEADNOTES

[1, 4–6] 29 Am Jur 2d, Evidence § 523 et seq.
[2] 16 Am Jur 2d, Constitutional Law § 553.
[3] 29 Am Jur 2d, Evidence §§ 588, 589.
[7] 81 Am Jur 2d, Witnesses § 602.
[8–10] 29 Am Jur 2d, Evidence §§ 497, 650.
[11, 12] 29 Am Jur 2d, Evidence § 708 et seq.
    81 Am Jur 2d, Witnesses § 619.
[13] 81 Am Jur 2d, Witnesses §§ 619, 621.
[14] 81 Am Jur 2d, Witnesses § 624.
[15] 75 Am Jur 2d, Trial §§ 237, 240.
[16] 81 Am Jur 2d, Witnesses § 240.
[17] 29 Am Jur 2d, Evidence §§ 363, 364.
[18] 81 Am Jur 2d, Witnesses § 619 et seq.

objected to testimony, offered by the prosecution as rebuttal to testimony for the defense, that the victim had told another person that he had argued with the defendant and was afraid of him, and testimony by a psychiatrist that the defendant clearly recalled his activities on the night of the murder. The defendant also claims that the prosecutor, in his argument to the jury, made several indirect references to the defendant's failure to take the stand. *Held:*

1. The defendant's assertive act of leading the police to evidence of the crime following questioning and his admission of guilt to the television newsman are seriously incriminating "statements" which amounted to confessions. The admissibility of the defendant's statements is not governed by the standards announced in *Miranda v Arizona,* 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966), because the instant case was originally tried before June 13, 1966. However, the prior law governing involuntary confessions is applicable, and the people bear the burden of proving voluntariness.

2. The trial court determined that because the defendant was kept incommunicado without counsel in police custody for close to 30 hours, "his free will and exercise of mind was not unfettered" and ruled that his transcribed statement to police was not admissible in evidence. In light of the trial court's finding that the transcribed statement was not voluntary and upon review of the record, the Court concludes that the "confessions" in issue which preceded the transcribed statement, *i.e.,* the defendant leading the police to evidence of the crime and the filmed television interview, were not voluntarily made. The defendant was in the custody of police officers when the television interview was made. At no time did he speak to anyone sympathetic to his position. Under all the circumstances, the possible attenuating effect of the facts which suggest voluntariness does not overcome the coercive influence of the others. Testimony indicating the defendant's role in discovery by the police of a rubber stamp used by the victim in his employment and of a jar containing money was improperly admitted into evidence. Further, the rubber stamp and the jar of money were the fruits of the illegally obtained filmed confession and are inadmissible on retrial.

3. Involuntary confessions may never be used, not only because the police broke the law but more importantly because an involuntary confession is always of questionable trustworthiness. Consequently, an involuntary confession is not a proper foundation for impeachment, whereas statements made prior to *Miranda* warnings may be sound foundation for impeachment.

Therefore, it was reversible error to rule that the filmed television interview would be admissible for impeachment purposes if the defendant testified in his own behalf.

4. The victim's state of mind did not relate to any element of the crime charged or any asserted defense. Although the defendant suggested that he was friendly with the victim to support the theory that someone else committed the crime charged, it was not claimed by the defendant that anything said or done by the victim exculpated the defendant or excused, justified or mitigated his alleged guilt. On the other hand, the danger of the testimony is that the jury would accept the victim's statements as showing the defendant's intentions, actions or culpability. The evidence bore the classic weakness of hearsay; that the declarant was unavailable for cross-examination. In the context of this case, even had a proper limiting instruction been given, the evidence should not have been admitted in view of its minimal probative value as against its substantial prejudicial effect.

5. The trial court erred in allowing the people to impeach a witness called by them who had admitted his participation in the crime as an accomplice. The right of the prosecution to impeach its own witness derives from and is co-extensive with the obligation to call that witness. The people are not required to call an accomplice as a res gestae witness. Absent the element of surprise, there is no "hostile witness" exception to the general rule that a party may not impeach its own witness.

6. An argument to the jury by the prosecutor that the defense had failed to prove its theory of the case does not constitute impermissible comment on the defendant's failure to take the stand where the argument reaches facts which could well have been within the knowledge of persons other than the defendant. It is not improper to argue that the people's evidence is uncontradicted.

7. Testimony for the prosecution by a psychiatrist was used only to rebut the defendant's claim that he had suffered an epileptic seizure on the night of the murder. No statement by the accused admitting the crime was elicited during the testimony as evidence on the issue of the defendant's guilt; therefore the testimony was admissible into evidence.

Justices Williams and Coleman concurred in reversal, but dissented on the issues of the rebuttal testimony about the defendant's friendship with the victim and the admissibility of the accomplice's testimony from the first trial:

1. The friendship of the defendant and the victim was an

important feature of the defense; it was a significant effort to negate any possible motive for the killing, the gravamen of the case. The prosecution's introduction of rebuttal testimony that the victim had an argument with the defendant and was frightened of him is both reasonable and logical, and the testimony should be admitted with appropriate cautionary instructions.

2. At retrial, unless the defense calls the accomplice as a witness, the jurors will never hear unquestionably relevant evidence that is at least as credible as the accomplice's subsequent testimony exculpating the defendant. Without the confessions, the accomplice's prior testimony is the principal inculpatory evidence remaining: without it, the prosecution does not have a case. The proposed Rules of Evidence permit a party to impeach his own witness. This case demonstrates the necessity of such a rule. The prosecution should be permitted to call the accomplice and impeach him with his prior sworn testimony.

Reversed and remanded for a new trial.

65 Mich App 56; 236 NW2d 583 (1975) reversed.

OPINION OF THE COURT

1. CRIMINAL LAW—CONSTITUTIONAL LAW—SELF-INCRIMINATION—CONFESSIONS.

A defendant's plainly assertive act of leading police to evidence of a crime following police questioning and his admission of guilt of a murder to a television newsman in a filmed interview made while he was in police custody are incriminating "statements" which amounted to confessions (US Const, Am V; Const 1963, art 1, § 17).

2. CRIMINAL LAW—EVIDENCE—ADMISSIBILITY—CONFESSIONS—VOLUNTARINESS.

The prerequisites for admissibility of a defendant's statements made while he was in police custody which were announced by the United States Supreme Court on June 13, 1966 are not applicable to a case which was originally tried before that date; however, a defendant's confession may still be inadmissible under the former rule of law governing involuntary confessions (US Const, Am V).

3. CRIMINAL LAW—EVIDENCE—ADMISSIBILITY—CONFESSIONS—VOLUNTARINESS—BURDEN OF PROOF.

The people bear the burden of proving the voluntariness of a confession offered as evidence (US Const, Am V; Const 1963, art 1, § 17).

4. Criminal Law—Evidence—Admissibility—Confessions—Voluntariness.

A finding by a trial court that a defendant's confession to police was inadmissible as involuntary is supported by the record where there was evidence that the defendant was questioned in police custody by a number of officers for close to 30 hours during which he was not left alone to sleep and did not eat, was not taken for arraignment when he made a statement which was partly inculpatory but was kept at the police station for further questioning, was not advised of his right to counsel, and was not allowed to consult friends or relatives during the questioning (US Const, Am V; Const 1963, art 1, § 17).

5. Criminal Law—Evidence—Admissibility—Confessions—Voluntariness.

An arraignment before a magistrate immediately preceding an incriminating statement by a defendant or a confession to a third person, such as a newsman filming a television interview, ordinarily strongly suggests that the statement is voluntary; however, a confession made after arraignment or to a third party may nevertheless be involuntary where the coercive influences which induced a prior involuntary confession continue (US Const, Am V; Const 1963, art 1, § 17).

6. Criminal Law—Evidence—Admissibility—Confessions—Voluntariness.

Confessions made while a defendant was in police custody which preceded by no more than 1-1/2 hours a confession which the trial court found involuntary, without any significant break in the events, are the product of the same conditions which rendered the later confession involuntary and likewise are themselves involuntary (US Const, Am V; Const 1963, art 1, § 17).

7. Criminal Law—Evidence—Admissibility—Witnesses—Impeachment—Confessions—Voluntariness.

Involuntary confessions may never be used for impeachment purposes, not only because the police broke the law but more importantly because an involuntary confession is always of questionable trustworthiness whereas statements made prior to a warning of rights may be a sound foundation for impeachment.

8. Criminal Law—Evidence—Hearsay—State of Mind.

Hearsay testimony about statements indicative of the declarant's

state of mind are admissible into evidence when that state is a material issue.

9. CRIMINAL LAW—EVIDENCE—HEARSAY—STATE OF MIND—LIMITING INSTRUCTION.

A limiting instruction to the jury should be given where hearsay evidence of a declarant's state of mind either explicitly or implicitly includes other factual matters to preserve the hearsay policy which would exclude the evidence if offered to prove the truth of those underlying facts.

10. HOMICIDE—MURDER—EVIDENCE—HEARSAY—VICTIM'S STATE OF MIND.

Hearsay evidence that a victim of first-degree murder had argued with the defendant and was frightened of him was not properly admitted into evidence in view of its minimal probative value as against its substantial prejudicial effect where the defendant's theory of the case was that he did not commit the crime rather than self-defense or another defense materially related to the victim's state of mind (MCL 750.316; MSA 28.548).

11. CRIMINAL LAW—WITNESSES—IMPEACHMENT—RES GESTAE WITNESSES.

A party generally may not impeach his own witness; however, the people may cross-examine and impeach res gestae witnesses whom they are required by law to produce at trial (MCL 767.40a; MSA 28.980[1]).

12. CRIMINAL LAW—WITNESSES—RES GESTAE WITNESSES—ACCOMPLICES.

The duty of the people to call res gestae witnesses does not extend to accomplices (MCL 767.40; MSA 28.980).

13. CRIMINAL LAW—WITNESSES—IMPEACHMENT—ACCOMPLICES.

The right of the prosecution to impeach its own witness is derived from and coextensive with the obligation to call that witness; therefore, the people may not call a defendant's accomplice as their witness and impeach him (MCL 767.40, 767.40a; MSA 28.980, 28.980[1]).

14. CRIMINAL LAW—WITNESSES—HOSTILE WITNESSES—IMPEACHMENT—SURPRISE.

The rule allowing impeachment on direct examination of a witness who, by giving unfavorable testimony, surprises the party who called him is designed to permit the party to show the jury why the witness has been called to testify; absent the element

of surprise, there is no "hostile witness" exception to the general rule that a party may not impeach its own witness.

15. CRIMINAL LAW—ARGUMENT OF COUNSEL—IMPERMISSIBLE COMMENT—DEFENDANT'S FAILURE TO TESTIFY.

An argument to the jury by a prosecutor that the defense had failed to prove its theory of the case that the defendant did not commit the crime charged does not constitute impermissible comment on the defendant's failure to take the stand where the argument reached facts which could well have been within the knowledge of persons other than the defendant; it is not improper to argue that the people's evidence is uncontradicted (US Const, Am V).

16. CRIMINAL LAW—EVIDENCE—ADMISSIBILITY—PSYCHIATRIC EXAMINATION—DEFENDANT'S STATEMENTS.

No statement made by an accused in the course of a court-ordered psychiatric examination may be used as evidence on the issue of guilt; however, testimony by a psychiatrist which was offered only to rebut the defendant's claim that he had suffered an epileptic seizure on the night of the crime and did not remember what took place that night was admissible into evidence.

OPINION CONCURRING IN PART AND DISSENTING IN PART

BY

WILLIAMS and COLEMAN, JJ.

17. HOMICIDE—MURDER—EVIDENCE—VICTIM'S STATE OF MIND.

*Hearsay evidence that a victim of first-degree murder had argued with the defendant and was frightened of him is properly admitted into evidence with appropriate cautionary instructions to the jury where the defendant had attempted to prove that he was friendly with the victim to negate any motive for the killing (MCL 750.316; MSA 28.548).*

18. CRIMINAL LAW—WITNESSES—IMPEACHMENT.

*The jurors should hear an accomplice's prior sworn testimony implicating a defendant in the crime charged where the accomplice's testimony on retrial exculpates the defendant, and any explanation the witness may have for the change, so that they can intelligently decide whom they will believe; such a case demonstrates the necessity of the proposed rule of evidence allowing a party to impeach his own witness (Proposed MRE 607).*

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, *L. Brooks Patterson,* Prosecuting Attorney, and *Robert C. Williams,* Chief Appellate Counsel, for the people.

*Denison, Porter & Bartush* for defendant.

RYAN, J. An Oakland County Sheriff's deputy found Robert Greene's body in the early morning hours of Sunday, March 17, 1963 shortly after Greene had been murdered in a small room in the Kroger Supermarket at which he was the assistant manager. Appellant Adoise White was charged with the murder and convicted in 1963. That conviction was reversed by the Court of Appeals and a new trial, from which the instant appeal arises, was ordered. *People v White,* 40 Mich App 433; 198 NW2d 904 (1972). This second conviction was affirmed by the lower appellate court. 65 Mich App 56; 236 NW2d 583 (1975). We granted leave to appeal. 397 Mich 811 (1976).

Appellant raises eight assignments of trial error. We find three of his contentions to have merit. We reverse and remand for a new trial.

## I

The first issue on appeal concerns the use of certain confessions obtained from White while he was in police custody shortly after the murder.

Appellant was employed as a stockman on the midnight shift at the same Kroger store at which Greene was assistant manager. He did not work on Saturday night (Sunday morning) March 17, but worked Sunday night (Monday morning) March 18. At approximately 9 a.m. Monday, about the time appellant was getting off work, he was questioned by police at the store about the murder and re-

lated robbery. Police suspicion focused on appellant because a witness reported that two weeks before the murder she had seen a car circle the Kroger store several times as it was closing and then follow Robert Greene's car for several blocks. A check of the license number indicated it belonged to Sam White, appellant's brother. After brief questioning at the store, appellant was taken into custody and conveyed to the police station where he was questioned further.

It is not entirely clear whether appellant was questioned continuously in the immediately succeeding hours or, if intermittently, how long the interrogation sessions lasted. However, it is clear that appellant was not at any time left alone in a jail cell or other area. At around 4 p.m. Monday afternoon, White broke down and started to cry and admitted he knew Robert Greene. The police then became convinced appellant was somehow involved in the robbery-murder and he was told he was formally under arrest. He was advised of some of his rights, but not of his right to consult an attorney.

An attorney who later represented appellant at the 1963 trial called the station sometime Monday and was told that appellant had not been arrested but that an investigation was being conducted. It does not appear the lawyer had been retained to represent appellant at that time.

Between 6 and 7 p.m. appellant was offered food but he refused it. Then, in the company of four or five police officers, he was taken to Flint. Sometime during the questioning, appellant had told police he was a "set-up man" for a robbery of the supermarket that was being planned by persons from Flint to be committed at a later date, and it was thought that appellant might be able to iden-

tify photographs of those persons. Appellant later said he invented the story about the people from Flint so that the police would leave him alone. The group arrived back in Pontiac around midnight and appellant was returned to an office in the police department. A police officer testified appellant slept on the way to Flint. White testified he did not.[1]

At 2:45 on Tuesday morning, after having been in the continuous presence and custody of police officers since 9 a.m. on Monday, the appellant gave the police a statement. In it he denied being involved in the execution of the robbery-murder and said, "I'm tired and sleepy. Been going through this since nine o'clock." After completing the statement around 4 a.m., appellant either fainted or fell asleep and was taken to the Pontiac jail.

Charles Hodges, appellant's nephew, whose name had been mentioned by appellant during the questioning, was then brought to the police station. Shortly thereafter Hodges confessed to participating in the robbery-murder and implicated appellant. He then led police to a jar of money hidden near some railroad tracks in Pontiac.

Appellant and Hodges were arraigned for the murder before a justice of the peace at 12 p.m. on Tuesday, March 19. Members of the news media, television film cameras, lights and microphones were present in the courtroom and, following the arraignment, appellant and Hodges, while in the custody of police officers, were interviewed and a film was made in which both men confessed their involvement in the murder to television reporter Ven Marshall.

---

[1] The appellant's motion to suppress was based on testimony taken at the first trial in 1963. Appellant testified only at the 1963 trial.

Upon leaving the justice court and before returning to the prosecutor's office where a formal transcribed confession was prepared (exhibit 17), appellant led police to a sewer in Pontiac where a check identification stamp used by the assistant manager at the Kroger store was found, and then to a jar of money in the basement of his brother's home.

Prior to the trial, the appellant moved to suppress all confessions made by him and invited the court's attention to the fact that there were several confessions in addition to the formal statement (exhibit 17).

A "*Walker* hearing"[2] was held which resulted in an oral suppression order followed by a written order. At the hearing, after announcing his findings of fact "that exhibit 17 was not voluntary", and conclusion of law that the exhibit would not be admissible at trial, the judge was asked by the defense counsel to clarify the scope of his order:

"*Mr. Eubank:* May it please the court, we have, as has been argued in these various matters, the so-called exhibit 17 and then we have the TV thing and then we have discussions by psychiatrists and it was my thought that anything following say, the fruit of the poisonous tree of the nature of a confession, a repetition of a confession before TV or psychiatrists would all be included.

"*The Court:* You can prepare and notice any order. Specifically I had in mind anything that led up to the exhibit 17, culminating the exhibit 17. And merely said for the reasons that I have so carefully enunciated, is not voluntary * * * ."

Nevertheless, during the trial the prosecution, without first making an offer of proof and over

---

[2] *People v Walker,* 374 Mich 331; 132 NW2d 87 (1965).

objection, elicited testimony from a police officer relating the circumstances of the discovery of evidence at the sewer and appellant's brother's basement. The officer, although not permitted by the court to repeat appellant's words, testified that *following conversations with White* the sites were visited and the check identification stamp and the jar of money found. Because of that testimony a motion for mistrial was made and denied.

The trial judge also ruled that although the film which was made at the time of the arraignment, recording appellant's confession, would not be admissible against him for substantive purposes it could be shown to the jury to impeach his credibility if he chose to testify. Appellant's trial counsel then stated that appellant would decline to testify. Appellant contends prejudicial error resulted from the police officer's testimony describing appellant leading police to the stamp and jar of money, and the trial court's ruling concerning the film. We agree.

The appellant's plainly assertive act of leading the police to evidence of the crime following his "conversations with" them and his admission of guilt of the murder, albeit to a television newsman, were seriously incriminating "statements" which amounted to confessions and were so regarded by White's counsel who sought their suppression.

Since the instant case is a retrial of a case originally tried prior to June 13, 1966, the prerequisites for admissibility of a defendant's in-custody statements announced that day in *Miranda v Arizona,* 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966), are not applicable. *Jenkins v Delaware,* 395 US 213; 89 S Ct 1677; 23 L Ed 2d 253 (1969). However, exclusion of appellant's confessions may

still be required under the law as it was prior to *Miranda,* governing involuntary confessions. *Davis v North Carolina,* 384 US 737; 86 S Ct 1761; 16 L Ed 2d 895 (1966).

Determination of the issue of voluntariness and resolution of the facts with respect to which there is conflicting testimony are decisions to be made initially by the trial court. The people bear the burden of proving voluntariness. *People v Zeigler,* 358 Mich 355, 364; 100 NW2d 456 (1960). Our role was described in *People v McGillen #1,* 392 Mich 251; 220 NW2d 677 (1974), where we said:

" '[T]he sole purpose of the *Walker* hearing is to determine the fact of voluntariness and a reviewing court is concerned only with the correctness of that determination. * * * "On this appeal we are required to 'examine the whole record and make an independent determination of the ultimate issue of voluntariness.' " '

"If after such a review we do not possess a definite and firm conviction that a mistake was committed by the trial judge in his ruling, we will affirm that ruling. *People v Hummel,* 19 Mich App 266; 172 NW2d 550 (1969)." 392 Mich 251, 257.

The trial court in the instant case issued an oral opinion from the bench following the *Walker* hearing and found:

"[T]hat no brutality or physical force was visited by law enforcement officers, or the police upon Adoise White but I do find he was kept under circumstances of being held so that *his free will and exercise of mind was not unfettered.* He was held under arrest called an investigation incommunicado without counsel for close to 30 hours. At a period before the elapse of this 30 hours he provided the material for exhibit 17.

"This was followed by an arraignment and after the arraignment he was *required* to repeat his confession of guilt before television cameras.

"I rule that exhibit 17 was not voluntary." (Emphasis supplied.)

And a moment later said:

"You can prepare and notice any order. Specifically I had in mind *anything that led up to exhibit 17.*"

The signed suppression order recited that use of the transcribed statement (exhibit 17) would violate appellant's privilege against self-incrimination and that the "admissions or confessions involved in the case at bar were *not voluntary*" (emphasis supplied).

It is now argued by the people that the trial court properly admitted the police testimony because it found appellant voluntarily led police to the stamp and money and that those items could not have been fruits of exhibit 17 which was taken and transcribed an hour and a half later that day. The noontime confession filmed for television is likewise said to be voluntary. We cannot agree.

From the language of the trial court quoted above, it is clear that the court determined that because White was kept incommunicado without counsel in police custody for close to 30 hours, "his free will and exercise of mind was not unfettered" as a result of which "he provided the material for exhibit 17". The court then held that "exhibit 17 was not voluntary" and added it "had in mind anything that led up to [it]".

It is uncontradicted that the filmed confession of guilt to newsman Ven Marshall, and the act of leading police to the incriminating evidence, not only "led up to" exhibit 17 but occurred just one and a half hours prior to making the formal statement.

Why the court admitted the police officer's testi-

mony and ruled as it did concerning the film in light of the finding concerning exhibit 17 and "all that led up to [it]" is unclear. The court's exclusion orders, both oral and written, appear to apply to *all* "the admissions or confessions involved in the case at bar" whether of a verbal or assertively behavorial character.

Although the court's ruling is concededly less than crystal clear concerning the pre-exhibit 17 confessions, its order excluding exhibit 17 as involuntary is unequivocal. We believe that conclusion to be a reasonable one supported by the record. In addition, in light of the court's finding that exhibit 17 was not voluntary, and upon our own review of the record, we conclude that the confessions in issue which preceded exhibit 17, the leading of police to evidence and the filmed statement, were not voluntarily made.

There was evidence, which the trial court believed, indicating appellant was subject to periods of questioning by a number of officers spanning the period between his arrest after work at approximately 9 a.m. Monday until 4 a.m. the following morning when he made a statement which was partly inculpatory and partly exculpatory. During this period he was not left alone to sleep and, although once offered food, did not eat. He was not taken before a magistrate for arraignment in the afternoon in accordance with the applicable statute[3] when the police became convinced of his participation, but was kept at the station for further questioning. He was not advised of his right to counsel[4] and was not allowed to consult friends or relatives. Ordinarily, an arraignment proceed-

---

[3] MCLA 764.26; MSA 28.885.

[4] The practice in justice of the peace courts in 1963 was to advise the accused of his right to have a lawyer appointed for the preliminary examination which would be held at a later date.

ing before an impartial magistrate immediately preceding the making of an incriminating statement is a strong suggestion that the statement is voluntary.[5] In addition, the fact that an incriminating statement is made to a television newsman who is recording and filming the event would, in most cases, weigh heavily in favor of a conclusion of voluntariness.

Still it is clear that a confession repeated after arraignment may, under all the circumstances, nevertheless be involuntary, see *Clewis v Texas,* 386 US 707; 87 S Ct 1338; 18 L Ed 2d 423 (1967), and a confession to a third person can be involuntary where coercive influences which induced a prior confession continue to be operative, see *Leyra v Denno,* 347 US 556; 74 S Ct 716; 98 L Ed 948 (1954); *People v McCullough,* 81 Mich 25; 45 NW 515 (1890). In the instant case the trial court found appellant was in the custody of police officers when the film was made. At no time did he speak to anyone sympathetic to his position. These are also relevant factors in determining voluntariness. *People v Cavanaugh,* 246 Mich 680; 225 NW 501 (1929).

Under all the circumstances at work in the instant case, we believe the possibly attenuating effect of the factors which suggest voluntariness does not overcome the coercive influence of the others. The trial court found exhibit 17 not voluntary. It was held inadmissible for substantive purposes, yet these other two confessions preceded the involuntary one by no more than one and one half hours.

---

[5] Because no record was made of the arraignment proceedings before the justice of the peace, we are unable to properly assess what effect the proceedings may have had upon the defendant's "free will and exercise of mind" which the trial court found to be "not unfettered" some one and one half hours later.

We find that here, where a confession is concededly involuntary, earlier additional confessions made immediately before it without any significant break in the stream of events are the product of the same factors which rendered the later confession inadmissible and likewise are not themselves voluntary. *Cf. Darwin v Connecticut,* 391 US 346; 88 S Ct 1488; 20 L Ed 2d 630 (1968).

It was reversible error, therefore, for the prosecutor to elicit testimony indicating appellant's role in the discovery of the stamp and money. Further, the stamp and jar of money were the fruits of the illegally obtained filmed confession. They are inadmissible on retrial.

The trial judge apparently concluded that the film of White's confessions to newsman Marshall (exhibit 21-A) was not admissible for substantive purposes because it was involuntarily given, but admissible to impeach the defendant's credibility if he testified, under the reasoning of *Harris v New York,* 401 US 222; 91 S Ct 643; 28 L Ed 2d 1 (1971).

The trial court said:

"I have already ruled in this case that with certainty that the exhibit 21-A could never be used by the people, being the presentment of their proofs. They have followed that ruling, abstained from it. The sole question before me is whether or not, if this defendant takes the stand, this particular exhibit 21-A might be admitted in evidence.

\* \* \*

"Gentlemen, I'm going to follow the law in this case in *Harris v New York,* of the majority opinion, and that opinion of the United States Supreme Court speaks very clearly. They simply said this, that this line of proof may not be admitted in any case in chief, the case which the people have just finished, that they have also said so clearly and unequivocally that such proof of

impeachment led this defendant to the stand and denied that he ever made controversial statements that the Court saw in camera in exhibit 21-A, that that could be admitted. If such circumstances develop in this case, I would want you to know that I will admit the evidence in exhibit 21-A. If you'll look at the bottom of page [222] in reference of the note as to two,

" 'If, for example, an accused confessed fully,' so forth and so on, then it goes on to explain why, and how limited to impeachment purposes only this statement might be admitted, I equate 21-A to the same effect and I've now examined it *in camera,* three separate times.

* * *

"Let there be no doubt about it that I will admit exhibit 21-A if the circumstances that I've already described here occur in the course of this trial and so saying I am giving defense counsel an opportunity to reflect upon what his course must be and also to decide with his own client."

In *Harris* the United States Supreme Court ruled that the defendant's inculpatory statement was inadmissible in the prosecution's case in chief because proper *Miranda* warnings had not been given, but could be admitted as a prior inconsistent statement to impeach the testifying defendant's veracity. The court pointed out, however, that the petitioner was not making the claim that the statement in question was coerced or involuntary. In allowing use of the statement for impeachment purposes, the court said:

"It does not follow from *Miranda* that evidence inadmissible against an accused in the prosecution's case in chief is barred for all purposes, *provided of course that the trustworthiness of the evidence satisfies legal standards." Harris v New York,* 401 US 224. (Emphasis supplied.)

Here the defendant did claim his pre-*Miranda*

filmed confession was involuntary and the trial court apparently agreed since he ruled it inadmissible.

The point is controlled by our decision in *People v Reed,* 393 Mich 342; 224 NW2d 867 (1975), in which we said:

"The difference between *Harris* and *[People v] Graham* [386 Mich 452; 192 NW2d 255 (1971)] and the instant case is that the former relate to impeachment because of failure to give due *Miranda* warnings, and the instant case relates to *involuntary confessions.* In order to deter the police from breaking the law, statements made prior to the *Miranda* warnings are unusable to prove the elements of the crime charged. However, such statements may still be used for impeachment purposes if otherwise trustworthy. Involuntary confessions, on the other hand, may never be used, both because the police broke the law but more importantly because an involuntary confession is always of questionable 'trustworthiness'. Consequently, an involuntary confession, which is of questionable trustworthiness, is not a proper foundation for impeachment, whereas statements prior to *Miranda* warnings may be a perfectly sound foundation for impeachment. It is instructive to note *Harris* expressly states, '[p]etitioner makes no claim the statements made to the police were coerced or involuntary.' 401 US 222, 224. Furthermore, *Harris* permits *Miranda*-barred evidence to impeach 'provided of course that the *trustworthiness* of the evidence satisfies legal standards'. (Emphasis added.) 401 US 222, 224.

"As indicated, the impropriety in using an involuntary confession for impeachment purposes is that it is untrustworthy evidence either to prove guilt or impugn credibility. The Supreme Court of Oregon put it forcefully and persuasively in *State v Smith,* 242 Or 223, 226; 408 P2d 942, 944 (1965), as follows:

"'An involuntary confession is just as untrustworthy when used for impeachment purposes as when used to prove guilt. Such a confession is of no greater credibil-

ity when used to prove defendant a liar than when it is
used to prove him guilty.'

"We therefore hold that an involuntary confession
because of its untrustworthy evidentiary value is not
usable either as direct evidence or for impeachment
purposes." 393 Mich 342, 355–356.

Defense counsel stated on the record that appellant would not take the stand because of the court's ruling on exhibit 21-A. Thus the issue was properly preserved. See *Reed, supra.*

We conclude it was reversible error for the trial court to rule that the filmed confession, exhibit 21-A, would be admissible for impeachment purposes if appellant testified.

## II

In an attempt to prove that the defendant bore no animus toward Greene and that the two were friendly, the defense produced several witnesses who testified that Greene had attended appellant's wedding and that he and Greene were friendly. In rebuttal and over objection, the people presented a witness, William Polasek, also employed at Kroger's, who related that two weeks before his death, Greene said he had had an argument with White and was frightened of him.[6] The trial court had

---

[6] The witness testified as follows:

"*A:* Yes, I did have a conversation.

"*Q:* Would you tell me what the conversation was, beginning with whoever said what and take it step by step.

"*Mr. Eubank [Defense Counsel]:* May I have a continuing objection.

"*The Court:* Yes, you may.

"*A:* I worked in the meat department, which is a closed off area, and Bob came back very upset.

"*Q:* When you say very upset you state a conclusion. Can you tell me—

"*A:* It wasn't, he was nervous, he was paler than usual, and he was very upset because he went into the conversation—

"*Q:* What did he say?

"*A:* He said he had just had words with White.

earlier sustained an objection to that same testimony thus precluding its use by the prosecution in the people's case in chief. When the evidence was admitted on rebuttal, no limiting instruction was given and none was requested, the evidence having been objected to earlier.

Appellant argues that admission of this testimony was prejudicial error. We agree.

Polasek's testimony that Greene claimed to be frightened of White is hearsay and, if admissible at all, must be so either because it falls within one of the exceptions to the hearsay rule or was offered for a purpose other than to prove the truth of the statement. The defendant claims the evidence was inadmissible hearsay because it was offered to prove the truth of the matter stated; that is, that the victim was afraid of White. The people argue that, since White had offered the evidence that he and the victim were friendly, the testimony was admissible under the state of mind exception to the hearsay rule.

The general rule in Michigan is that statements

"*Q:* What did you say, if anything?

"*A:* I told him, just stay away from the man. Get ahold of Ed McAllister, who is the manager of the store, and I said he'll take care of it. If this is going to be this upsetting to you, tell the manager and stay away from him. You have no reason to be around him.

"*Q:* Did he seem to be frightened?

"*A:* Yes.

"*Q:* Did he say anything to you to indicate—

"*A:* He told me, I can remember so plain, he put his elbow up on his desk and he was just like this, almost trembling. He was almost trembling and he stood there at the desk, and I can't recall his exact words or anything like that because it was so long ago, but I can remember telling him to stay away from the man. And to get ahold of Ed McAllister, the store manager and have him handle the situation.

"*Q:* Did he say he was frightened?

"*A:* Yes.

"*Q:* Did he actually say that?

"*A:* He told me he had just had an argument or something.

"*Q:* Did he say that he was frightened of the defendant?

"*A:* Yes, absolutely."

indicative of the declarant's state of mind are admissible when that state is in issue in the case. *Hazen v Elmendorf,* 365 Mich 624; 113 NW2d 892 (1962) (when state of mind is material); *Pease v Jennings,* 180 Mich 682; 146 NW 260 (1914); McCormick, Evidence (2d ed), § 294.

Whether Polasek's testimony that Greene said he was frightened of the appellant is characterized as circumstantial evidence of Greene's state of mind (a nonhearsay purpose) or as within the hearsay exception allowing a declarant's statement of his then existing state of mind (a hearsay purpose) is a fine distinction which is not of great importance for our present purposes.

Greene's hearsay statement is primarily of value for its tendency to prove his state of mind. Indeed, the state of mind exception to the hearsay rule exists because of the recognition that such evidence is often the best evidence available of the declarant's state of mind. McCormick, Evidence (2d ed), § 294. However, certain dangers accompany the use of such hearsay declarations.

"Declarations such as those involved here frequently include assertions other than as to state of mind, as, for example, assertions that the defendant's acts caused the state of mind. The truth of those assertions may coincide with other issues in the case, such as whether the defendant's acts did in fact cause the state of mind. When this is so, the normal practice is to admit the declaration and direct the jury to consider it only in proof of the state of mind and to disregard it as evidence of the other issues. Compliance with these instructions is probably beyond the jury's ability and almost certainly beyond their willingness. Where there is adequate evidence on the other issues, this probably does little harm. But in a case where the mental state is provable by other available evidence and the danger of harm from improper use by the jury of the offered

declarations is substantial, the judge's discretion to exclude the declarations has been recognized." Mc-Cormick, Evidence (2d ed), § 294, p 696.

The state of mind evidence here in question was introduced in rebuttal to the appellant's evidence that he and Greene were friendly. Its highest degree of relevance was its tendency to shed some light upon Greene's state of mind. However, Greene's state of mind was not a significant issue in the case. It did not relate to any element of the crime charged or any asserted defense. It had, at best, only a tenuous and remote materiality to any of the issues in the case.

When a *victim's* state of mind is in issue in a homicide case it is usually because the defense asserted is either self-defense as justification for the killing, suicide or accidental death. When such claims are made by the defendant it would be highly relevant for the prosecution to show that at or near the time of the decedent's death *he* said something which tends to prove circumstantially that he feared the defendant, as suggesting it was unlikely that he was an aggressor; as tending to disprove a suicidal bent; or as tending to disprove accidental death. Where such claims are made, a number of courts have allowed the admission of a victim's statements of fear of the defendant as constituting such circumstantial proof. See *United States v Brown,* 160 US App DC 190; 490 F2d 758 (1973), in which the court discussed the issue at length. Michigan courts have permitted, indeed required, the admission of statements indicative of the state of mind of a homicide victim where self-defense is raised. *People v Freeman,* 32 Mich App 321; 188 NW2d 200 (1971) (statement of fear of the defendant); *People v Ake,* 362 Mich 134; 106 NW2d 800 (1961) (threats against the defendant).

Here, however, there are no such claims by the defendant. The people's theory was felony murder. The appellant's theory was that he did not commit the crime. Self-defense, accidental death or suicide were not raised, nor were any analogous defenses. Although appellant may have in some sense raised the issue of Greene's state of mind, by suggesting that the two were friendly, it was not claimed that anything said or done by Greene exculpated appellant or excused, justified or mitigated his alleged guilt. Greene's state of mind was, therefore, only remotely and collaterally related to the real issues in the case.

On the other hand, the statement attributed to the declarant, Greene, that he had an argument with White and was frightened of him tended to relate forcefully to the appellant's character and the acts attributed to him, matters which were very prominently "in issue" in the case. The danger is obvious: that the jury would accept Greene's statement "as somehow reflecting on *defendant's* state of mind rather than the victim's—*i.e.,* as a true indication of the defendant's intentions, actions or culpability". *United States v Brown, supra,* 198; 490 F2d 766.

It is against this possibility that the need for a limiting instruction is vital. Where the state of mind evidence either explicitly or implicitly includes other factual matters, a limiting instruction should be given to preserve the hearsay policy which would exclude the evidence if offered against appellant to prove the truth of those underlying facts. See *United States v Brown, supra,* and cases cited therein. Even where state of mind bears substantial relevance to the issues in a case, these additional factual matters may present so great a likelihood of prejudice that the evidence

should be excluded. See McCormick, quoted *supra;*
*People v Lew,* 68 Cal 2d 774; 441 P2d 942 (1968);
*People v Hamilton,* 55 Cal 2d 881; 362 P2d 473
(1961).

The evidence of Greene's statement bore the
classic weakness of hearsay: the declarant was
unavailable for cross-examination; thus the defend-
ant was faced with the unchallengeable, uncross-
examinable, ringing denunciation by the absent
declarant that he was frightened of White, carry-
ing with it the clear implication that there was
good reason for Greene to be frightened. The
likelihood of prejudice was aggravated by the
court's failure to instruct the jury that the decla-
ration was admissible only as bearing upon the
declarant's state of mind and should not be consid-
ered as proof that the victim and appellant actu-
ally had an argument, or as proof of the *appel-
lant's* state of mind or as tending in any way to
show his guilt of the charge against him. In the
context of this case, even had a proper limiting
instruction been given, the evidence should not
have been admitted in view of its minimal proba-
tive value as against its substantial prejudicial
effect.

We observe in passing that by eliciting testi-
mony that the appellant and Greene were friends,
the appellant raised the issue of the relationship
between the two men. It was obviously proper for
the people to answer that claim by impeachment
of the defense witnesses or contradiction by other
witnesses who might know whether the two saw
each other socially or were friendly as appellant
claimed. However, the need to balance the proba-
tive value of the particular evidence against the
danger of prejudice resulting from it remains.

The people's need to use the state of mind

evidence in the case at bar was not great. Greene's state of mind was not itself an important issue and bore only a remote and tenuous connection to the real claims and defenses in the case. The likelihood of prejudice was substantial because the statement contained matters which coincided with the issues in the case and was highly and unfairly damaging to the defendant's case.

Whatever *logical relevance* the evidence had to the issues in the case was substantially outweighed by unfair prejudice resulting from it. We are persuaded that the trial court, under all the circumstances in the case, abused its discretion in admitting the statement and that the evidence should not be admitted upon retrial.

### III

Appellant next contends the trial court erred in allowing the people to impeach a witness called by them. We agree.

Charles Hodges, appellant's former codefendant in the murder of Robert Greene, pled guilty to the crime in 1963. Hodges had testified for the prosecution in 1963 and prior to appellant's second trial apparently indicated to the prosecution that he would again testify for the people. Shortly before the trial, however, Hodges recanted his former testimony and informed the prosecutor that he would deny that either he or appellant had robbed the Kroger store and killed Robert Greene. Despite that warning, the prosecutor called Hodges as a witness for the people.

Hodges' testimony began with his statement that he could not remember what he had said at the earlier trial. The trial court then permitted the prosecution to read the prior testimony, in the

presence of the jury, for the ostensible initial purpose of refreshing Hodges' memory. Hodges then said he had lied in 1963. Thereupon the trial court instructed the jury that it should only consider the prior testimony it had heard as bearing on the witness's credibility. Later, the trial court permitted the showing of a 1963 filmed interview in which Hodges admitted to newsman Ven Marshall that he had participated in the murder. The jury was again instructed, prior to the start of deliberations, that the film and prior testimony were only to be considered as bearing on Hodges' credibility respecting his claimed inability to remember whether he participated in the murder of Greene.

Our cases are in accord with the general common-law rule that a party may not impeach his or her own witness. *People v Lee,* 307 Mich 743; 12 NW2d 418 (1943); *Thelen v Mutual Benefit Health & Accident Ass'n,* 304 Mich 17; 7 NW2d 128 (1942).[7] The rule is subject to numerous exceptions, however, one of which allows the people to cross-examine and impeach res gestae witnesses they are *required* by law to produce at trial. *People v Elco (On Rehearing)* 131 Mich 519; 91 NW 755 (1903); *People v Burnstein,* 261 Mich 534; 246 NW 217 (1933); *People v Lockhart,* 242 Mich 491; 219 NW 724 (1928); *People v Cellura,* 288 Mich 54; 284 NW 643 (1939). The rule allowing the impeachment of res gestae witnesses by the people is codified in the Code of Criminal Procedure. MCLA 767.40a; MSA 28.980(1).

The duty to call res gestae witnesses, however, does not extend to accomplices. *People v McCullough,* 81 Mich 25; 45 NW 515 (1890); *People v*

---

[7] The Federal Rules of Evidence permit a calling party to impeach his own witness. FRE 607.

*Resh,* 107 Mich 251; 65 NW 99 (1895); *People v Knoll,* 258 Mich 89; 242 NW 222 (1932). Hodges, having admitted his participation in the crime ten years earlier, was therefore not required to be called by the people. The people assert that although they were not required to call Hodges, a res gestae witness who is also an accomplice *may* be impeached in the event that the people do call him. We reject this contention and agree with the decision of the Court of Appeals in *People v Fidel,* 37 Mich App 338; 194 NW2d 732 (1971), that the right of the prosecution to impeach its own witness is derivative of and coextensive with the obligation to call that witness.

Moreover, the people cannot claim the witness was properly impeached because the people were surprised by his testimony. The witness, Hodges, had advised the prosecutor prior to trial that he would recant his former testimony. The rule allowing impeachment of the witness who surprises a party is designed to extend to that party an opportunity to show the jury why the witness was called. See *People v Payne,* 131 Mich 474; 91 NW 739 (1902); *People v Gillespie,* 111 Mich 241; 69 NW 490 (1896).

The people finally contend that it was proper for them to impeach Hodges because he was an adverse or hostile witness. We cannot agree that absent the element of surprise there is any "hostile witness" exception to the general rule which would permit the impeachment of a witness as in the instant case. *People v Babcock,* 301 Mich 518; 3 NW2d 865 (1942), stands for the proposition that the people may impeach res gestae witnesses, but not that they may impeach witnesses they are under no duty to call.

We do not approve of the practice of the people

in a criminal case calling a witness they are under no duty to call, and who they have reason to know will deny all knowledge of the event and thereby add nothing of substance to the people's case, for the sole purpose of placing before the jury highly damaging evidence that the jury must be instructed may be considered only for impeachment purposes. *Cf. People v Giacalone,* 399 Mich 642; 250 NW2d 492 (1977). We seriously doubt the effectiveness of the limiting instruction in such a case. *Cf. Bruton v United States,* 391 US 123; 88 S Ct 1620; 20 L Ed 2d 476 (1968).

Finally, the people do not contend and we do not find that the former trial transcript was admissible for substantive purposes under the former testimony exception to the hearsay rule. Hodges was not unavailable. He was in attendance at the trial. He did not refuse to testify or assert a privilege not to testify. See *People v Goldman,* 349 Mich 77; 84 NW2d 241 (1957) (refusal to testify); *People v Pickett,* 339 Mich 294; 63 NW2d 681 (1954) (claim of privilege). Here, the witness had *changed* his testimony. Under our prior cases the inconsistent statements are admissible only for impeachment purposes. *People v Anderson,* 2 Mich App 718; 141 NW2d 353 (1966); *People v Miner,* 138 Mich 290; 101 NW 536 (1904).[8]

---

[8] The heart of the instant issue is the use of prior statements for substantive purposes. The Proposed Michigan Rules of Evidence, if adopted in the present form, would substantially change the law in this area. To illustrate, if on retrial Hodges testifies and is subject to cross-examination, a prior inconsistent statement could be considered by the factfinder as substantive evidence. Proposed MRE 801(d)(1). Whether a statement is in fact inconsistent may depend on the circumstances. In many cases a lack of memory is not considered inconsistent. *See People v Durkee,* 369 Mich 618; 120 NW2d 729 (1963). In some instances, however, the trial judge may properly find that an assertion of lack of memory is really a repudiation of the prior statement and therefore inconsistent with it. *See* McCormick, Evidence (2d ed), § 251, and cases cited therein. We further note that the Federal Rules of Evidence indicate a similar result, although only

IV

Appellant's trial counsel indicated in opening remarks to the jury that appellant would prove his friendship with Robert Greene and would testify to it. However, appellant, as we have indicated, did not take the stand.

In closing argument, the people suggested that the defense did not prove what it had promised. Appellant contends the argument constituted impermissible comment on appellant's failure to take the stand in violation of his Fifth Amendment rights. *Griffin v California,* 380 US 609; 85 S Ct 1229; 14 L Ed 2d 106 (1965).[9]

We think this argument lacks merit. The import of the people's closing argument was that the

---

the prior sworn testimony would be admissible for substantive purposes. FRE 801(d).

On the other hand, if, upon a new trial, Hodges is for some reason unavailable, his testimony at the first trial would be admissible under current law as former testimony. *People v Pickett,* 339 Mich 294; 63 NW2d 681 (1954). If the witness is present but testifies to a lack of memory, claims a privilege, or refuses despite an order of the court to testify, he may nevertheless be deemed unavailable and the former testimony rule will apply just as if he could not be present. Proposed Michigan Rules of Evidence 804(a), 804(b)(1).

[9] A fair sample of the people's closing argument is as follows:

"Remember when he [defense counsel] told you in his opening statement—he told you how he was going to discount that fingerprint? Remember he was going to prove to you that Adoise White and Bob Greene had lunch two or three times a week? He was going to prove to you that Bob Greene came over to Adoise's house two or three times a month and that they would drive in Bob Greene's car? What evidence? What witnesses have you heard to that? First, Adoise White and Bob Greene ever went out to lunch together? Ever? Not one witness has taken the stand and testified to that and Mr. Eubank couldn't read it to you from a transcript. Have you heard any witnesses testify that Bob Greene went over to Adoise's house two or three times a month? Not one. Not one witness has taken the stand and testified to that and been cross-examined. Now, Mr. Eubank couldn't read you anything—any such testimony from the record. Now we haven't heard testimony from one single witness in the course of this trial that whoever saw Adoise White in Bob Greene's car. Not one. There isn't one shred one iota of evidence to support that."

defense had not proved its case; that there was a lack of evidence in favor of the defense on this point. The argument reaches facts which could well be within the knowledge of persons other than appellant. It is not improper to argue that the people's evidence is uncontradicted. *People v Parker,* 307 Mich 372; 11 NW2d 924 (1943). See generally Anno: *Comment or Argument by Court or Counsel That Prosecution Evidence Is Uncontradicted as Amounting to Improper Reference to Accused's Failure to Testify,* 14 ALR3d 723. We find no error here.

## V

The defense also argued to the jury that appellant did not murder Robert Greene but that on the night of the murder appellant went to a party, and feeling as though he was about to have an epileptic seizure went to his car where indeed he had a seizure after which he slept for several hours. The defense presented an expert medical witness who testified on cross-examination by the people that a person who had suffered an epileptic seizure would not remember his activities. The people then called a psychiatrist to whom appellant had repeated his confession in 1963 to testify in rebuttal. The witness testified that appellant had remembered the events of March 16, 1963 in detail.

Appellant urges, relying on *People v Stevens,* 386 Mich 579; 194 NW2d 370 (1972), that the testimony left the clear inference that appellant had admitted killing Robert Greene and was therefore improper.

In *People v Stevens, supra,* we held that no statement made by an accused in the course of a court-ordered psychiatric examination can be used as evidence on the issue of guilt. The statement in

*Stevens* was one admitting commission of the crime. In the instant case, the people did not elicit from the witness the fact of confession. The testimony was used only to rebut appellant's claim that he had suffered an epileptic seizure on the night of the murder. The confession to the psychiatrist was not elicited. We find no error based on *Stevens.* See *People v Brown,* 399 Mich 350; 249 NW2d 693 (1976).

## VI

We will not consider appellant's final allegations of error. One of those allegations concerns an unresponsive answer by a witness and is unlikely to arise again. The second concerns the use of the film of Hodges. Since we have decided it was error for the people to impeach Hodges, it is not necessary to reach this issue.

Reversed and remanded.

KAVANAGH, C. J., and LEVIN, FITZGERALD, and BLAIR MOODY, JR., JJ., concurred with RYAN, J.

WILLIAMS and COLEMAN, JJ. *(concurring in part, dissenting in part).* We concur with our Brother RYAN's opinion, except for parts II and III.

Part II minimizes the relevance of victim Greene's alleged friendship with defendant White. We believe this was an important feature of the defendant's defense and justified admitting the testimony of prosecution rebuttal witness Polasek. As our Brother RYAN says, "[i]n an attempt to prove that the defendant bore no animus toward Greene and that the two were friendly, the defense produced several witnesses who testified that * * * he and Greene were friendly". This was a significant effort by the defendant to negate any possible

motive for the killing, which, of course, was the gravamen of the case. In these circumstances, the justification for the prosecution's introduction of witness Polasek's testimony that victim Greene "had an argument with White and was frightened of him" seems to us to be both reasonable and logical. We therefore would admit this testimony with appropriate cautionary instructions.

Part III effectively precludes the future admission of accomplice Hodges' prior testimony, given under oath at the first trial, implicating the defendant in the crime. According to our Brother RYAN, the prosecution cannot call Hodges as a witness and then impeach him with his prior sworn testimony, because of the ancient and often criticized rule against impeaching one's own witness. Nor can the prosecution introduce Hodges' prior testimony under the prior recorded testimony exception to the hearsay rule, because that exception is applicable only when the declarant is not available to testify, and in this case the declarant, Hodges, is still available.

At retrial, unless the defense calls Hodges as a witness, thereby opening him up for impeachment, the jurors will never hear unquestionably relevant evidence that is at least as credible as Hodges' subsequent testimony exculpating the defendant. And it is unlikely that the defense will call Hodges because, without the defendant's now suppressed confessions, Hodges' prior testimony is the principal inculpatory evidence remaining. Without it, the prosecution does not have a case.

The jurors should hear both sides of the story before making a decision on the defendant's guilt or innocence. They should hear Hodges' prior inculpatory testimony, his present exculpatory testimony and any explanation he may have for the

change. Then, presented with the whole picture, the jurors can intelligently decide who they will believe.

Proposed Michigan Rule of Evidence 607 permits a party to impeach his or her own witness. This case demonstrates the necessity for such a rule. We would permit the prosecution to call Hodges and impeach him with his prior sworn testimony.