PEOPLE v SMELLEY

Docket No. 274033. Submitted April 7, 2009, at Detroit. Decided May 26, 2009. Approved for publication August 13, 2009, at 9:00 a.m.

A jury in the Wayne Circuit Court, Craig S. Strong, J., convicted Jovan D. Smelley of second-degree murder, felon in possession of a firearm, possession of a firearm during the commission of a felony, and assault with intent to do great bodily harm less than murder. The defendant appealed.

The Court of Appeals *held*:

1. The trial court abused its discretion by admitting the hearsay testimony of several prosecution witnesses about statements the homicide victim had made to the witnesses before his death. The victim had told the witnesses that he had fought with the defendant and had feared the defendant because the defendant wanted to kill him. The statements do not fit the hearsay exception for statements of the declarant's then-existing state of mind, MRE 803(3). Instead, the statements are statements of memory or belief offered to prove the fact remembered or believed, which are inadmissible under MRE 803(3). The trial court's error requires a reversal because it appears more probable than not that the erroneous admission of the hearsay testimony affected the outcome of the trial, because the untainted evidence against the defendant was tenuous.

2. The trial court erred by admitting hearsay testimony by the victim's sister concerning another person's purported statement of identification. MRE 801(d)(1)(c) provides that a statement is not hearsay if the declarant testifies at the trial and is subject to cross-examination concerning the statement, and the statement is one of identification of a person made after perceiving the person. In this case, however, the declarant testified that he did not see the defendant shoot the victim. The trial court's error in this regard, combined with the other errors at trial, merits reversal and retrial.

3. The trial court erred by admitting prior bad acts evidence relating to the defendant's past possession of firearms. No evidence was introduced at trial that the defendant had a gun on the

night of the shooting. The prior bad acts evidence was highly prejudicial and, combined with the other errors at trial, merits reversal and retrial.

4. The trial court erroneously admitted as evidence of flight the defendant's arrest by an agent of the Drug Enforcement Administration two weeks after the homicide involved in this case. Evidence of flight is generally admissible when it is probative of a defendant's consciousness of guilt. However, mere departure from the jurisdiction does not give rise to an inference of consciousness of guilt. There was no record evidence that the defendant left the jurisdiction because he was aware of the homicide or feared being apprehended for it. Any minimal probative value as circumstantial evidence of guilt was substantially outweighed by the danger of unfair prejudice. The trial court's error in this regard, combined with the other errors at trial, merits reversal and retrial.

5. The defendant was not denied his constitutional right to a trial attorney without a conflict of interest. The record evidence does not support the defendant's claim that his attorney had a conflict of interest that affected the attorney's performance.

Reversed and remanded for a new trial.

*Michael A. Cox*, Attorney General, *B. Eric Restuccia*, Solicitor General, *Kym L. Worthy*, Prosecuting Attorney, *Timothy A. Baughman*, Chief of Research, Training, and Appeals, and *Ana Quiroz*, Assistant Prosecuting Attorney, for the people.

*Elizabeth L. Jacobs* for the defendant.

Before: CAVANAGH, P.J., and FORT HOOD and DAVIS, JJ.

PER CURIAM. Defendant appeals by right his jury convictions of second-degree murder, MCL 750.317, felon in possession of a firearm, MCL 750.224f, possession of a firearm during the commission of a felony, 750.227b, and assault with intent to do great bodily harm less than murder, MCL 750.84. We reverse and remand for a new trial.

Defendant was convicted for the murder of Lester Terrell Bridgeforth, who was shot in the back of the

neck on September 26, 2003, while driving a vehicle in which his friend, Ramon McLeod, was a passenger.

## I. EVIDENTIARY ISSUES

On appeal, defendant argues that several of the trial court's evidentiary rulings constituted abuses of discretion that entitle him to a new trial. We agree. Evidentiary rulings that are preserved for appeal are reviewed for an abuse of discretion, but preliminary questions of law involving the admissibility of evidence are reviewed de novo. *People v Lukity*, 460 Mich 484, 488; 596 NW2d 607 (1999). A trial court's decision on a motion for new trial is reviewed for an abuse of discretion. *Coble v Green*, 271 Mich App 382, 389; 722 NW2d 898 (2006). An abuse of discretion occurs when the court chooses an outcome that falls outside the range of principled outcomes. *Woodard v Custer*, 476 Mich 545, 557; 719 NW2d 842 (2006).

### A. INADMISSIBLE HEARSAY—MRE 803(3)

First, defendant argues that he was denied a fair trial by the erroneous admission of several hearsay statements purportedly made by the victim, Bridgeforth, to other people before he was killed. We agree.

We set forth each claimed erroneous admission in turn, starting with the testimony of Bridgeforth's mother, Venetta King. The prosecution asked King: "Did your son prior to this homicide did he ever express to you any concerns that he had in terms of his state of mind?" Defense counsel objected on the ground that the question would elicit inadmissible hearsay testimony. The prosecution responded that the testimony was offered as MRE 803(3), existing state of mind, evidence and relied on the cases of *People v Fisher*, 449 Mich 441;

537 NW2d 577 (1995) (*Fisher II*), and *People v Ortiz*, 249 Mich App 297; 642 NW2d 417 (2002). The trial court overruled defendant's objection. This exchange between the prosecution and the witness followed:

> *Q*. Ms. King, did your son prior to his homicide did he express any fears or concerns or what his concerns [sic] any concerns at all regarding this person who was identified in court by the name of Jovan [defendant]?
>
> *A*. Yes.
>
> *Q*. Tell the jury, tell the Court?
>
> *A*. Well, just before he was killed he was [sic] he came into my room and my baby girl and myself was in there and he was telling us that Jovan was after him and trying to kill him and we didn't know nothing about it and he wanted me to move.
>
> *Q*. Did he say how long? Did he say why he thought Jovan was trying to kill him?
>
> *A*. No, he didn't tell me why.
>
> *Q*. Did he tell you how long he's been feeling like that?
>
> *A*. I know he was talking about the fights that they had and that was it he was just mad that day and he was telling us about we need to move and that they were trying to kill him.
>
> *Q*. Who is they?
>
> *A*. He said Jovan he kept specifically saying his name.

Bridgeforth's sister, Sabrina Bridgeforth was also asked by the prosecution, "When you learned of your brother's homicide, do you recall him expressing anything?" Defense counsel objected that such testimony would be inadmissible hearsay and the prosecution again cited the "state of mind exception." The objection was overruled and the prosecution continued:

> *Q*. When you learned of your brother's death and you have Ramon McLeod telling you Stone [defendant] did it at

the hospital, knowing now your brother has been mur-
dered, did anything come to mind to you in terms of your
brother's expression of his state of mind as it relates to
Jovan Smelley?

*A.* Well, I know that it had in the comments of him [sic]
and Stone fighting or beefing through the neighborhood.

\* \* \*

*Q.* Did your brother ever express anything to you in
terms of his state of mind prior to his death about this
defendant and any concerns that he had regarding any [sic]
him getting hurt in any way shape or form by this defen-
dant?

*A.* That he disputed with him on and on and they had
fights occasionally.

\* \* \*

*Q.* Did your brother ever express anything further
beyond that as to whether the beef or the—by the way
when you talk about a beef what is that?

*A.* Fighting.

*Q.* Did your brother ever tell you that it was all over with
and that he and Jovan were good friends again?

*A.* No, he told me that people were out here trying to kill
him.

*Q.* And when you say, what did he say about people are
trying [sic]?

*A.* He didn't say a name he just said that dispute or you
know.

Raymond McLeod, who was with Bridgeforth when
he was fatally shot, testified in response to the prosecu-
tor's questioning, as follows:

*Q.* What did [Bridgeforth] tell you as to relates [sic] as to
how he was getting along with Stone?

*A.* He just told me that he got into it with him at the gas station. At the bar I don't know. But that's what he told me.

*Q.* Sir, were those two separate occasions according to what he told you?

*A.* Yes.

*Q.* When you say he got into it was that a fist fight, a gun fight, or what kind of fight?

*A.* A fist fight.

McLeod's mother, Pamela McLeod, also testified. The following exchange between the prosecutor and the witness occurred:

*Q.* Prior to his death, Ms. McLeod, did [Bridgeforth] ever express to you any concern or concerns that he had regarding any one person any other human being?

*A.* Yes.

*Q.* Tell us first of all who it was that he expressed concerns about?

*A.* He told me that he wouldn't be living that long because he was into it with a guy named Stone.

\* \* \*

*Q.* How long before you learned of [Bridgeforth's] homicide did he say that to you that he wouldn't be living very long?

*A.* The day before he got killed.

In response to the prosecution's questioning, Stephanie Bridgeforth, another sister of Bridgeforth, testified:

*Q.* Now did your brother ever express to you any concerns that he had about Stone?

*A.* Yes, he was scared of him because he had got into a few fights with him and he was saying that, you know, he got into the fight and he was saying to you know, quash the fight, the beef.

On appeal, the prosecution claims that all this testimony was properly admitted into evidence, arguing: "All of this challenged testimony served and was offered to show the victim's state of mind with regard to discord between himself and Defendant before he was killed, which in turn relevantly demonstrates motive for the killing." The prosecution argues, as it successfully did in the trial court, that this hearsay was not excluded by MRE 802 because it was excepted under MRE 803(3), which provides:

> A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will.

The prosecution relies on *Fisher II* to support its position that the hearsay evidence was admissible to establish Bridgeforth's state of mind. In that case, the defendant was accused of killing his wife. Several oral and written statements that were made by the victim about the defendant, their marriage, her relationships with other men, her future plans and intentions, and the like were admitted as evidence of her state of mind before she was killed. Several of the admissions were challenged on appeal.

The first appeal to the Supreme Court, *People v Fisher*, 439 Mich 884 (1991) (*Fisher I*), resulted in the grant of a new trial for the reason that the defendant "was denied a fair trial by the admission of hearsay evidence regarding the victim's state of mind." *Id.* In support of its holding, the Court quoted at length from *People v White*, 401 Mich 482; 257 NW2d 912 (1977), which noted particularly that the victim's state of mind

is usually only in issue in a homicide case when self-defense, suicide, or accidental death are raised as defenses to the crime. *Id.* at 504. When such a defense is raised, the *White* Court held, "it would be highly relevant for the prosecution to show that at or near the time of the decedent's death [the decedent] said something which tends to prove circumstantially that he feared the defendant, as suggesting it was unlikely that he was an aggressor; as tending to disprove a suicide bent; or as tending to disprove accidental death." *Id.* The *White* Court indicated that no such defense was raised by the defendant in that case, accordingly, the victim's state of mind was "only remotely and collaterally related to the real issues in the case." *Id.* at 505.

However, the *White* Court noted, a statement attributed to the victim "that he had an argument with [the defendant] and was frightened of him tended to relate forcefully to [the defendant's] character and the acts attributed to him, matters which were very prominently 'in issue' in the case." *Id.* The danger was obvious, the *White* Court concluded, because the jury would accept the victim's statement " 'as somehow reflecting on *defendant's* state of mind rather than the victim's—*i.e.*, as a true indication of the defendant's intentions, actions or culpability.' " *Id.*, quoting *United States v Brown*, 160 US App DC 190, 198; 490 F2d 758 (1973) (emphasis in original). Thus, in *Fisher I*, even though a limiting instruction had been given to the jury, the Court held that "there was such a great likelihood of prejudice that the evidence should have been excluded because the relevance of the evidence was substantially outweighed by the prejudice. MRE 403." *Fisher I*, *supra* at 885.

Before retrial, the defendant in *Fisher* was granted an interlocutory appeal by our Supreme Court following the trial court's grant of the prosecution's motion

seeking permission to introduce into evidence certain oral and written statements made by the defendant's wife before she was killed. *Fisher II, supra* at 443-444, 454 n 16. The defendant appeared to argue that he would again be denied a fair trial by the admission of hearsay evidence regarding his wife's state of mind before she was killed, which it appeared the *Fisher I* Court meant to exclude from evidence. The trial court had held that statements made by the defendant's wife that were known by the defendant were not hearsay. *Id.* at 448. The *Fisher II* Court agreed, holding that such statements were not hearsay, were admissible to show the effect they had on the defendant (not to prove the truth of the matter asserted), and were relevant to the issues of marital discord, motive, and premeditation. *Id.* at 449-450.

The trial court also admitted certain undescribed statements made by the defendant's wife that were not known by the defendant on the ground that they were " 'non-hearsay circumstantial evidence as to the existence and extent of marital discord which is admissible as proof of motive for Defendant to kill his wife.' " *Id.* at 448. It does not appear that the *Fisher II* Court agreed with the trial court's reasoning, although it agreed with the ultimate conclusion, in that it held that the statements

> that were not known to the defendant about her plans to visit Germany to be with her lover and her plans to divorce the defendant upon her return are hearsay. They are admissible, however, because they satisfy the exception to the hearsay rule for "statement[s] of the declarant's then existing . . . intent, plan . . . [or] mental feeling . . . ." MRE 803(3). [*Id.* at 450-451.]

Further, the *Fisher II* Court addressed the confusion associated with its peremptory reversal order that led to

the interlocutory appeal. *Id.* at 454. In *Fisher I*, the Court ordered that " 'hearsay evidence regarding the victim's state of mind' where its 'relevance . . . was substantially outweighed by the prejudice' " was to be excluded from evidence. *Fisher II, supra* at 453-454, quoting *Fisher I, supra* at 884, 885. The *Fisher II* Court noted: "The people properly interpreted this order to mean that any of decedent wife's statements that expressed fear of the defendant, or that depicted significant misconduct of the defendant tending to show him to be a 'bad person,' were inadmissible." *Id.* at 454.

The prosecution in our case also relied on the case of *People v Ortiz* in support of its position that the disputed testimony was admissible. In *Ortiz, supra* at 300, a case that sets forth few background facts, the defendant was convicted of murdering his former wife. *Id.* at 300. On appeal, the defendant argued that numerous statements made by the victim before her death were improperly admitted. *Id.* at 307. The statements admitted under MRE 803(3) included that the victim was afraid of the defendant, that she thought he was stalking her, that defendant physically assaulted her and threatened to kill her. *Id.* at 307. Relying on *Fisher II, supra* at 448-450, the *Ortiz* Court held that the evidence was admissible. *Ortiz, supra* at 310.

After reviewing the relevant caselaw, we agree with this Court's holding in *People v Moorer*, 262 Mich App 64, 69; 683 NW2d 736 (2004): "We find the application of MRE 803(3) in *Fisher [II], supra*, inapposite, and the perfunctory analysis of MRE 803(3) in *Ortiz, supra*, unhelpful in determining whether the statements at issue in this case were properly admitted." We are particularly dismayed by the lack of relevant background facts set forth in these cases. For example, in *Fisher II* the Court held that the victim's statements

that expressed fear of the defendant were not admissible. This statement, removed from the context and circumstances of relevant facts, offers little guidance. As the *Moorer* Court noted, a proper analysis of admissibility requires that the nature of each statement be considered specifically, as well as the purpose for each statement's admission. *Id.* at 66.

In *Moorer*, the defendant was convicted of first-degree premeditated murder for shooting and killing William Armour, who was dating the defendant's estranged wife. *Id.* at 65. On appeal, the key issue was "whether the trial court erred in holding that the out-of-court statements made to others by the victim were admissible pursuant to the hearsay exception for state of mind, MRE 803(3)." *Id.* at 66. In particular, five witnesses testified, generally, that Armour had told each of them that the defendant wanted to or was trying to kill him, that the defendant had threatened to kill him, and that Armour had a verbal confrontation with the defendant. *Id.* at 66-67. Like in our case, the prosecution argued that the statements were admissible pursuant to MRE 803(3), *Fisher II*, *supra*, and *Ortiz*, *supra*, and the trial court agreed. *Moorer*, *supra* at 69. With regard to *Ortiz*, this Court in *Moorer* held that "[t]he *Ortiz* opinion provides only a general, conclusory analysis of the admissibility of the various statements . . . ." *Id.* at 72. And, "[t]he fact that the statements in this case were relevant to issues of motive, deliberation, and premeditation, MRE 402, as in *Ortiz*, does not resolve the hearsay impediment." *Id.*

The defendant in *Moorer* argued that the admitted statements in part concerned Armour's state of mind, but Armour's state of mind was irrelevant. *Id.* Further, the statements that Armour had a confrontation with

the defendant, that the defendant wanted to kill him and threatened to kill him were statements of memory and belief offered to show that the "defendant had committed certain acts that were consistent with defendant's having killed Armour." *Id.* at 73. This Court agreed, holding that the statements "relate to past events and are specifically excluded under MRE 803(3) as statements of 'memory or belief to prove the fact remembered or believed . . . .' " *Id.* This Court also held that "[t]he statements in *Fisher [II]* described the intentions and plans of the declarant, not the past or presumed future actions of the defendant." *Id.* Thus, the *Moorer* Court concluded that "the trial court erred generally in admitting Armour's statements to others concerning defendant's threats and actions." *Id.* at 74.

In our case, the prosecution repeatedly questioned witnesses about their knowledge of Bridgeforth's state of mind before he was killed. The prosecution claimed in the trial court, and claims here on appeal, that Bridgeforth's state of mind was relevant to show the "discord between himself and Defendant." But, as the *White* Court noted, the victim's state of mind is usually only relevant in homicide cases when self-defense, suicide, or accidental death are raised as defenses to the crime. *Id.* at 504. Defendant's defense was that he was not the person who killed Bridgeforth. Thus, as in *White*, Bridgeforth's state of mind was not a significant issue in this case and did not relate to any element of the crime charged or any asserted defense. To the contrary, it was defendant's state of mind that was at issue in this case. To the extent that this hearsay had any relevance, it was "only remotely and collaterally related to the real issues in the case," *White, supra* at 505, and its probative value was substantially outweighed by its prejudicial effect. See *id.*

Even if evidence of Bridgeforth's state of mind were relevant, it would still be inadmissible. It is clear that the prosecution sought to use the contested testimony to demonstrate the truth of the facts asserted in Bridgeforth's alleged statements, i.e., that Bridgeforth had some fights with defendant, that he thought that defendant was after him, and that defendant was trying to kill him. And, ultimately, in light of the acrimony between defendant and Bridgeforth, it is likely that defendant killed Bridgeforth. In fact, throughout closing argument the prosecution repeatedly referenced the disputed testimony in association with her purported theory that "dying men speak the truth." The testimony was clearly hearsay.

Again, specifically, King testified that Bridgeforth told her that defendant "was after him and trying to kill him," and that he had fights with defendant. Sabrina Bridgeforth testified that Bridgeforth told her that he had fights with defendant and people were trying to kill him. Raymond McLeod testified that Bridgeforth told him that he had fights with defendant. Pamela McLeod testified that Bridgeforth told her that he would not be living long because he "was into it" with defendant. Stephanie Bridgeforth testified that Bridgeforth told her he was scared of defendant because he had been in some fights with him.

These contested statements constituted hearsay and they were not within the scope of the exception provided by MRE 803(3). Like in *Moorer, supra* at 73, Bridgeforth's statements were statements of memory or belief that were offered to prove the facts remembered or believed. In particular, the statements included that Bridgeforth and defendant had fought in the past and Bridgeforth believed that defendant was after him and was trying to kill him. These statements were

offered to prove that, consistent with this acrimonious history between Bridgeforth and defendant, it is likely that defendant killed Bridgeforth. Clearly, these statements allegedly made by Bridgeforth to his family and friends should not have been admitted into evidence either because they were irrelevant or because they constituted inadmissible hearsay. Thus, the trial court abused its discretion by admitting this testimony. See *Woodard*.

However, evidentiary error does not require reversal unless, after an examination of the entire cause, it appears more probable than not that the error affected the outcome of the trial in light of the weight of the properly admitted evidence. MCL 769.26; MCR 2.613(A); *People v Whittaker*, 465 Mich 422, 426-427; 635 NW2d 687 (2001); *Lukity, supra* at 495. In this case, we conclude that this threshold for reversal has been met.

The untainted evidence in support of the prosecution's theory that defendant shot and killed Bridgeforth was tenuous. Excluding the inadmissible hearsay and other evidence discussed below, the only evidence possibly linking defendant to the murder comes from Ramon McLeod, who was with Bridgeforth on the night he was killed. But on that night, after Bridgeforth was shot and the vehicle he was driving crashed into a pole, McLeod told the first witness at the scene, a woman who lived nearby, that no one had been shot. McLeod also told the first police officer on the scene that he and Bridgeforth had been out celebrating his birthday at the bar and that he (McLeod) had fallen asleep in the vehicle and remained asleep until he awoke to find himself trapped by the dashboard of the vehicle.

More importantly, however, at trial, McLeod admitted that before Bridgeforth was shot, McLeod did not

see defendant actually shoot at their vehicle. He *heard* shots being fired as defendant's vehicle was passing theirs, going in the opposite direction, and defendant was driving the vehicle. But McLeod had also testified that two or more people were in defendant's vehicle when it left the bar, shortly before this shooting. And, although McLeod had *heard* shots being fired in the bar parking lot before Bridgeforth was fatally shot, McLeod had not seen defendant shooting a gun there. Further, a gun of the type involved in this shooting was never recovered. And, finally, before reaching their ultimate verdict about three days after the close of proofs, the jurors had twice declared that they could not reach a verdict.

In summary, after review of the entire case, it appears more probable than not that the erroneous admission of the hearsay evidence affected the outcome of the trial. However, even if we were equivocal about this conclusion, we would reverse and remand for a new trial because of the cumulative effect of other evidentiary errors discussed below. See *People v Unger*, 278 Mich App 210, 261; 749 NW2d 272 (2008).

### B. NOT HEARSAY—MRE 801(d)(1)

Next, defendant argues that the trial court erred by admitting third-party testimony concerning a statement of identification that did not meet the standard set forth in MRE 801(d)(1)(C). We agree.

At trial, over a hearsay objection by the defense, the prosecution was allowed to question Sabrina Bridgeforth about what Ramon McLeod said to her at the hospital after she found out that her brother had been killed. In response to the objection, the prosecution claimed that the anticipated testimony was offered as a statement of identification permitted under MRE 801(d)(1)(C). The prosecution claimed that Ramon

McLeod was going to testify that he "saw the shooter" and that Sabrina Bridgeforth was "merely repeating his statement of identification at the proceedings." After noting that the identifier normally testifies first, the trial court nevertheless permitted the testimony, which was elicited through the following questions:

> *Q.* Tell us exactly what Ramon said to you the first time you see him about your brother's death?
>
> *A.* I asked Ramon what happened and was he with my brother and he told me that Stone killed him and he was in a black escalade [sic].
>
>               \*   \*   \*
>
> *Q.* So the first thing out of his mouth is Stone did it?
>
> *A.* Yes.

The phrase "Stone did it," was repeated at least seven times during the prosecution's direct examination of this witness. Although this issue was raised in defendant's motion for a new trial, the court did not address this claim.

MRE 801(d)(1)(C) provides that a statement is not hearsay if "[t]he declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is . . . one of identification of a person made after perceiving the person . . . ." As defendant argues, however, one of the problems with the admission of Sabrina Bridgeforth's testimony is that Ramon McLeod, who testified *after* Sabrina Bridgeforth, clearly testified that he, in fact, did *not* see defendant shoot Bridgeforth. Thus, the prosecution's assertion to the trial court that McLeod would testify that he "saw the shooter" and that this witness was "merely repeating his statement of identification at the proceedings" was not true. If Ramon

McLeod had testified before Sabrina Bridgeforth, this damaging and repeated hearsay testimony would not have been admitted into evidence. Therefore, even if we were to conclude that this type of a statement could be a statement of "identification" within the contemplation of MRE 801(d)(1)(C), the statement in this case was not such a statement. We conclude that this repeated "Stone did it" testimony was damaging inadmissible hearsay that, combined with the other errors in this trial, merits reversal and retrial.

### C. BAD ACTS EVIDENCE—MRE 404(b)

Next, defendant argues that the trial court erroneously permitted the admission of prior bad acts evidence relating to defendant's past possession of firearms. We agree.

On cross-examination, defense counsel questioned Officer Kurtis Staples concerning the type of gun used in the homicide, and Staples replied "a .223," which is a type of assault rifle. Then Officer Staples was asked whether he had any credible proof that defendant ever owned or possessed a .223 assault rifle, and Staples replied in the negative. On re-direct examination by the prosecution, the following exchange occurred:

> *Q.* Officer Staples, [defense counsel] asked you as to whether you had any direct knowledge regarding the defendant having a .223 weapon or any kind of weapon period, do you remember that?

> *Defense Counsel:* Objection, your Honor, what I said was a .223 weapon. I did not say any kind of weapon. I specifically focused on the .223.

> *The Court:* All right.

> *Q.* Officer Staples, when the defendant was arrested in November of '98 for carrying a concealed weapon, do you know if that was a .233 [sic]?

*A.* No, I don't.

*Q.* And when he was arrested and pled guilty of [sic] April of 1999 for carrying a concealed weapon, do you know if that was a .223?

*A.* No.

*Q.* And when he was arrested and convicted in Oakland County in September of 2001 for carrying a concealed weapon, do you know if that was a .233 [sic]?

*A.* No.

*Q.* And, sir, when he was arrested by Redford Township after a search warrant was executed at the address on Codding, do you know if there was a .223 located in that house amongst the 7 or 8 weapons recovered?

*Defense Counsel:* Objection as to facts not in evidence.

*Q.* Do you know if a .223 was involved, sir?

*A.* I don't know.

Later, defendant moved for a mistrial based on the admission of this evidence, to which the prosecution responded that there was no miscarriage of justice. Defendant subsequently withdrew his motion for mistrial. However, defendant raised this issue in his motion for a new trial, but the trial court held that even if it erred by allowing the admission of this evidence, it did not affect the outcome of the trial.

On appeal, the prosecution concedes that the prosecutor's questions about other weapons and weapons-related convictions resulted in the admission of irrelevant evidence. Nevertheless, the prosecution contends that the error was harmless. We disagree. This error, much like the error involving the alleged "statement of identification," was deliberately injected into the proceedings by the prosecution and, in light of the other erroneously admitted "state of the mind" evidence, was particularly inflammatory and prejudicial. See *People v*

*Minor,* 213 Mich App 682, 686; 541 NW2d 576 (1995). The facts were that there was no evidence presented during this trial that defendant had a gun on the night of the shooting—neither at the bar before the shooting, nor during the shooting. We conclude that the erroneous and deliberate introduction of this highly prejudicial testimony, combined with the other errors in this trial, merits reversal and retrial.

### D. EVIDENCE OF FLIGHT

Next, defendant argues that the trial court erroneously admitted evidence that defendant was arrested by a Drug Enforcement Administration (DEA) agent in Georgia two weeks after the homicide as "evidence of flight." We agree.

On the first day of trial, the prosecutor advised defense counsel that she was going to introduce evidence that defendant was arrested in Georgia by a DEA agent two weeks after the homicide in this case. Defense counsel objected to the admission of this evidence before the proceedings began on the grounds that (1) he had received unfair and untimely notice of the evidence, (2) the evidence was irrelevant, and (3) the evidence was more prejudicial than probative. The prosecutor responded that the evidence was being offered as evidence of flight. Defense counsel rebutted the claim, arguing that the evidence was not relevant. At that time, defendant did not know he was wanted for a crime and, in fact, he was not wanted for a crime because there was no warrant for his arrest. Thus, defendant had every right to go wherever he wanted. The trial court took the matter under advisement, but eventually the DEA agent did testify that defendant was arrested in Georgia about two weeks after the homicide. A flight instruction was also given to the jury.

Evidence of flight is generally admissible when it is probative of a defendant's consciousness of guilt. See *People v Coleman*, 210 Mich App 1, 4; 532 NW2d 885 (1995). That is, defendant's flight from the scene of the crime, the jurisdiction, and the police can constitute circumstantial evidence of consciousness of guilt and, accordingly, the fact of guilt itself. See *id*.; McCormick, Evidence (4th ed), § 263, p 462. However, mere departure from the crime scene or, in this case, the jurisdiction, does not give rise to such an inference. See *People v Hall*, 174 Mich App 686, 691; 436 NW2d 446 (1989).

In its brief on appeal, the prosecution merely asserts, without supporting argument, that the evidence was properly admitted. It was not. There is no evidence in the record that defendant left the jurisdiction because he was aware of, or motivated by fear of apprehension for, the homicide in this case. See *Hall*. The prosecution did not rebut defense counsel's claim that, before or during the time defendant was in Georgia, defendant had no knowledge about the matter. Thus, although the prosecutor is permitted to argue the evidence and all reasonable inferences arising from the evidence, *People v Bahoda*, 448 Mich 261, 282; 531 NW2d 659 (1995), considering the record evidence here, the prosecutor could not reasonably imply that in leaving the jurisdiction defendant was in "flight" in the legal sense. Further, even if this evidence had minimal probative value as circumstantial evidence of defendant's guilt, that value was substantially outweighed by the danger of unfair prejudice. See MRE 403. Accordingly, the trial court abused its discretion by admitting this evidence. This error, combined with the other errors in this trial, merits reversal and retrial.

In summary, defendant is entitled to a new trial. Several significant evidentiary errors occurred during

the trial of this matter that, after review of the entire case, lead us to conclude that the errors, either individually or in combination resulted in a miscarriage of justice. See MCL 769.26. The admission of extensive inadmissible and irrelevant, but highly damaging evidence, that appears in part to have been deliberately injected into this proceeding, likely prejudiced defendant in light of the fairly weak evidence against him.

## II. DEFENSE ATTORNEY ISSUES

On appeal, defendant also raises two issues regarding his attorney. First, defendant claims that he was denied his right to a conflict-free attorney. Second, defendant raises several claims in support of his argument that he was denied the effective assistance of counsel. In light of our conclusion that a new trial is warranted in this matter, we will only address the first claim. See *People v Rutherford*, 208 Mich App 198, 204; 526 NW2d 620 (1994).

### A. CONFLICT-FREE DEFENSE ATTORNEY

Defendant argues that he was denied his constitutional right to a conflict-free attorney because his attorney, Kevin Hammons, failed to call an exculpatory witness, Kevin Barlow, after the prosecutor threatened to rebut that witness's testimony with evidence that Hammons had asked defendant's family members for money to pay off that witness. We disagree.

To establish a conflict of interest claim, a defendant must demonstrate that an actual conflict of interest existed and that it negatively affected his attorney's performance. *People v Smith*, 456 Mich 543, 556-557; 581 NW2d 654 (1998). Here, defendant claims: "The conflict of interest arose because the attorney, Kevin Hammons, tried to extort more money from the family by claiming that he

needed to pay off Barlow." But, as the trial court held, the only evidence supporting defendant's assertion was provided by defendant's brother, Charles Smelley.

The record evidence revealed that Charles did not want defendant represented by Hammons and the Smelley family had hired another attorney as co-counsel with Hammons. During a tape-recorded conversation defendant had with Charles on a jail telephone, Charles told defendant that Hammons had told him to pay the witness money to come to court. At the *Ginther*[1] hearing, Charles testified that he had been told by Hammons to give him money to pay Barlow to go to court. Hammons also testified at the *Ginther* hearing, and vehemently denied the allegation. Hammons further indicated that, after a pretrial motion did not go well, Charles had threatened him with bodily harm. Barlow testified at the *Ginther* hearing that he was neither offered nor paid any money for his testimony. The trial court held that the *Ginther* hearing testimony of Hammons was more credible than Charles's testimony. In light of the trial court's superior ability to judge the credibility of the witnesses who appeared before it, as well as the record evidence, we defer to the trial court's conclusion that Hammons's testimony was more believable than the testimony of defendant's brother. See *People v Canter*, 197 Mich App 550, 561; 496 NW2d 336 (1992). Accordingly, the trial court's denial of defendant's motion for a new trial premised on this conflict of interest claim is affirmed.

### III. PROSECUTORIAL MISCONDUCT

Defendant raises three claims of prosecutorial misconduct on appeal. First, defendant claims that the

---

[1] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

prosecution failed to disclose that defense counsel was not conflict-free. For the reasons discussed above, this claim is without merit. Second, defendant argues that the prosecution committed misconduct by admitting the MRE 404(b) evidence pertaining to defendant's past possession of firearms. This error was addressed above. Third, defendant argues that the prosecution purposefully withheld discovery materials until the day of trial in violation of a court order and in order to have an unfair advantage. Although the record appears to support this claim, in light of our conclusion that a new trial is warranted in this matter, we need not address this moot claim. See *Rutherford*.

Reversed and remanded for a new trial. We do not retain jurisdiction.