*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

TYLER MATTHEW BRIGHAM,

        Defendant-Appellant.

UNPUBLISHED
February 13, 2020

No. 342621
Roscommon Circuit Court
LC No. 17-007819-FH

Before: FORT HOOD, P.J., and BECKERING and BOONSTRA, JJ.

PER CURIAM.

Defendant, Tyler Matthew Brigham, appeals as of right his conviction by a jury of third-degree criminal sexual conduct (CSC-III), MCL 750.520d(1)(b) (penetration using force or coercion). The trial court sentenced him to 35 months' to 15 years' imprisonment. We affirm.

Defendant's conviction arose from the sexual penetration of the victim, CP, during the early morning hours of February 14, 2016, after an informal party at a home in Roscommon. In a police interview after CP reported the incident, defendant denied having any sexual contact at all with CP that night. The police initially believed him. After testing of CP's underwear showed DNA consistent with defendant, the police concluded that he had lied in his interview, and defendant was charged with CSC-III. At trial, defendant's attorney, Aaron Coltrane, focused from the outset—by way of his arguments and witness examinations—on a defense of consensual sex, although in the midst of trial he also tried to plant a small seed of doubt regarding whether any sex had occurred at all. After his conviction, defendant filed a motion for a new trial, which the trial court denied. This Court granted defendant's motion for a remand, and an evidentiary hearing took place regarding defendant's claim that Coltrane had rendered ineffective assistance of counsel at trial. After the evidentiary hearing, the trial court again denied defendant's motion for a new trial.

## I. UNPRESERVED ALLEGATIONS OF ERROR

Defendant contends that trial errors occurred in connection with (1) testimony and commentary regarding defendant's credibility during his police interview, (2) statements by the trial court that allegedly amounted to testimony, and (3) testimony by the police regarding

defendant's failure to submit to a second interview. He also contends that, in each instance, Coltrane rendered ineffective assistance of counsel by failing to object to or otherwise address the errors.

This Court reviews unpreserved issues for plain error affecting substantial rights. *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999). Under the plain-error doctrine, reversal is warranted if a "clear or obvious" error occurred that "affected the outcome of the lower court proceedings." *Id*. And even if this standard is satisfied,

> an appellate court must exercise its discretion in deciding whether to reverse. Reversal is warranted only when the plain, forfeited error resulted in the conviction of an actually innocent defendant or when an error seriously affected the fairness, integrity or public reputation of judicial proceedings independent of the defendant's innocence. [*Id*. at 763-764 (citation, quotation marks, and brackets omitted).]

"Whether a person has been denied effective assistance of counsel is a mixed question of fact and constitutional law. A judge must first find the facts, and then must decide whether those facts constitute a violation of the defendant's constitutional right to effective assistance of counsel." *People v LeBlanc*, 465 Mich 575, 579; 640 NW2d 246 (2002). The court's findings of fact are reviewed for clear error, and questions of constitutional law are reviewed de novo. *Id*.

To obtain relief based on ineffective assistance of counsel, a party "must show that counsel's performance fell short of [an] . . . objective standard of reasonableness and that, but for counsel's deficient performance, there is a reasonable probability that the outcome of the . . . trial would have been different." *People v Ackley*, 497 Mich 381, 389; 870 NW2d 858 (2015) (quotation marks, citation, and brackets omitted). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. (quotation marks and citation omitted). A defendant must overcome a strong presumption that counsel's actions were based on sound trial strategy. *Id*. at 388.

## A. COMMENTARY REGARDING DEFENDANT'S CREDIBILITY

Defendant contends that Trooper Tyler Dougherty and Lieutenant Rick Sekely with the Michigan State Police improperly testified that defendant was not credible during his police interview when he said that no sex had taken place between him and CP. Defendant also takes exception to certain comments the trial court and prosecutor made in connection with the testimony. Finally, defendant objects to a statement made by Trooper Dougherty during the interview itself.

## 1. PLAIN-ERROR ANALYSIS

We note, initially, that certain portions of the testimony and commentary cited by defendant were simply not erroneous. "It is generally improper for a witness to comment or provide an

opinion on the credibility of another witness,[1] because credibility matters are to be determined by the jury." *People v Dobek*, 274 Mich App 58, 71; 732 NW2d 546 (2007); see also *People v Musser*, 494 Mich 337, 349; 835 NW2d 319 (2013). However, a witness may comment on another witness's demeanor. See, generally, *Dobek*, 274 Mich App at 71. Accordingly, Trooper Dougherty's testimony about defendant's demeanor of leaning back during the interview and Coltrane's reference to this demeanor during questioning were not plainly erroneous. In addition, Trooper Dougherty's statement that "we have our . . . ways of . . . talking to somebody to try to figure out the truth" was not a direct comment on defendant's credibility and therefore was not plainly erroneous. Nor did Lieutenant Sekely, during his testimony, directly comment on defendant's credibility; he answered a *hypothetical* question about what it means if he obtains a statement from a person and the "statement was [the] complete opposite of what the evidence shows." And he again was answering a hypothetical question when opining that lying to police officers is worse than lying to one's mother about eating a cookie. Finally, the trial court did not directly comment on defendant's credibility when it allowed certain testimony by Trooper Dougherty because, in the trial court's words, the trooper had experience with "deceptive training and things of that nature and interviewing techniques." References to a police officer's training in general are not inappropriate, see, generally, *People v Ramsdell*, 230 Mich App 386, 404; 585 NW2d 1 (1998), but more importantly, the court's ruling *benefited the defense* because Coltrane was able to imply, from the further allowed questioning, that it would be very frightening for a 22-year-old such as defendant to be interviewed by the police.

We agree with the prosecutor that it is the following three instances that could potentially be construed as improper comments on credibility: Trooper Dougherty's statement during the interview itself when he said, "And, from what [CP] says happened, looks like what happened;" Trooper Dougherty's testimony that he was seeing a "lot more" deception in the interview video after gaining experience as a trooper; and the prosecutor's question to Lieutenant Sekely during which she referred to "the fact that [defendant] was not truthful during his . . . interview with you guys[.]"[2]

The statement made by Trooper Dougherty during the interview itself was not prejudicial because the jury was clearly informed that Trooper Dougherty, around the time of the interview, did *not* in fact believe that the offense had "happened" as described by CP. He testified, "[A]t the time I believed [defendant] and he stated that no sexual assault had occurred and nothing sexual along the lines [sic] occurred that night." The statement from the interview that defendant challenges on appeal was not outcome-determinative. *Carines*, 460 Mich at 763.

We find that the other two instances also did not amount to outcome-determinative errors. *Id.* First, in *Dobek*, 274 Mich App at 71, a police officer testified that he had "no concerns about lying" by the victim in that case. This Court stated, "Given that [the officer] was called as a witness by the prosecutor and that a criminal prosecution against defendant was pursued, the jurors surely

---

[1] Defendant was, in essence, a "witness" in this case because his videotaped interview was played for the jury.

[2] The prosecutor asked Lieutenant Sekely if he "look[ed] at" this fact, and Lieutenant Sekely answered, "Yes."

understood that [the officer] believed that the victim was telling the truth even without the disputed testimony." *Id.* The pertinent circumstances in the present case are analogous. In addition, it is apparent from all the circumstances that Coltrane's primary theory was consent. In his opening statement, Coltrane said that the evidence would show that CP was drunk and "all over everybody" at the party. He said that she wanted "love or affection[.]" He talked about her wanting to turn the gay man who was present at the party "straight." He said, "[I]t was Valentines [sic] Day and she was recently divorced." He said that the bedroom lock where CP was sleeping could only be opened from the inside. Coltrane stated, "[T]here's only one conclusion. That is that it wasn't forceful, it wasn't rape." Coltrane conducted an extremely thorough cross-examination of CP in which he implied, among other things, that she was lonely, that she wanted to turn the gay man straight, that she spent a lot of time talking to defendant on the night in question, that she wanted companionship that night, and that she was flattered by the attentions of someone as young as defendant. In his closing argument, Coltrane said that CP gave "different stories," that there were no signs of physical force on CP, and that the prosecution had not established its case beyond a reasonable doubt. He said that defendant "did not forcefully rape" CP.

This primary theory of consent was reasonable in light of DNA evidence linking defendant to sexual activity with CP.[3] Admitting that defendant lied during his police interview was part and parcel of this defense. The implication Coltrane made through cross-examination was that defendant lied because of nervousness and because of not wanting to admit that he had sex with CP because his fiancée, who was also at the party on the night in question, had come with him to the police station for the interview. Given the primary theory put forward,[4] and given that the jurors would have assumed that the police disbelieved defendant's assertion during the interview that no sex had occurred between him and CP, see *id.*, no outcome-determinative error is apparent.

## 2. INEFFECTIVE-ASSISTANCE ANALYSIS

At the *Ginther* hearing, Coltrane testified that his primary trial strategy was to suggest that the sex had been consensual. Defendant's new attorney, Shannon Smith, asked Coltrane at the *Ginther* hearing why he did not object to testimony about signs of deception. Coltrane said that he was trying to paint the police in a poor light.

---

[3] The DNA evidence is discussed more thoroughly later in this opinion. There was no conclusive DNA match such as one sometimes finds in other cases; the evidence showed only certain probabilities that the DNA in CP's underwear was from defendant or a paternal relative of defendant. These probabilities, however, were extremely damaging in light of the fact that CP and defendant were both at the party and in light of CP's testimony that defendant raped her.

[4] As explained more thoroughly *infra*, Coltrane, during the course of trial and likely in response to certain questions posed by the jurors, changed his strategy slightly and adopted a somewhat "blended" defense in which he was arguing consent but also attempting to plant a small seed that there may have been no sexual contact at all between defendant and CP. Given the evidence produced at trial, we do not think the challenged statements about defendant's credibility were the determining factor for the jury's rejection of this "secondary" theory.

Given what defendant told police—that he did not have any sex with CP—and given the DNA evidence and defendant's admission to Coltrane from the very start of the attorney-client relationship that he had indeed had sex with CP,[5] Coltrane was in a difficult position.[6] In his questioning of the police, he emphasized that they did not go to the crime scene or investigate the doors in the house. It was clearly part of his trial strategy to imply that the police investigation had been shoddy. It was reasonable trial strategy to allow the officers to opine about defendant's deception in the interview, because this raises the specter of why the police did not pick up on this deception in the first place but only came to the "deception" conclusion *after* receiving the DNA results. This is particularly pertinent with regard to Trooper Dougherty, who was a very new trooper at the time of the incident and said that later, after gaining experience, he saw more deception. That Trooper Dougherty changed his mind about defendant's believability supported the theory that he had been less than thorough in his investigations soon after the incident occurred.

At any rate, even if Coltrane's actions fell below an objective standard of reasonableness, defendant, given the posture of the defense, the DNA evidence, and the fact that the jury would presume that the police witnesses disbelieved defendant's "no sex" assertion, see *Dobek*, 274 Mich App at 71, defendant cannot show a reasonable probability that the outcome of the trial would have been different if counsel had acted differently, *Ackley*, 497 Mich at 389.[7]

## B. INFRINGEMENT OF DEFENDANT'S FIFTH AND SIXTH AMENDMENT RIGHTS

Defendant contends that certain testimony by Trooper Dougherty and Lieutenant Sekely infringed on his constitutional rights to counsel and to remain silent, see US Const, Ams V and VI, because the officers informed the jury that defendant was not speaking to the police after receiving advice from counsel. We note, initially, that Lieutenant's Sekely simply made no comment about defendant's right to silence or retention of an attorney. Lieutenant Sekely stated that he that he "attempted" to follow up with defendant and "did intend" to follow up with him, but he gave no indication regarding *why* this follow-up did not occur. Defendant has shown no "clear or obvious" error or any ineffective assistance of counsel in association with the testimony. *Carines*, 460 Mich at 763; *Ackley*, 497 Mich at 389.

During his cross-examination of Trooper Dougherty, Coltrane asked why Trooper Dougherty did not visit the scene of the incident. Trooper Dougherty said, "We got the DNA that we needed . . . and then after the original incident I was advised not to have any form of contact

---

[5] Defendant conceded that he told Coltrane this.

[6] He could not, for example, put defendant on the stand to deny sex with CP, given that defendant admitted to the sex. See, e.g., MRPC 3.4(b) (indicating that a lawyer shall not assist a witness in testifying falsely).

[7] We reject defendant's implication that the court's failure to recite the words "reasonable probability" in its ruling, see *Ackley*, 497 Mich at 389, requires reversal. It is evident that the trial court knew and was applying the pertinent legal standards.

with ah, [defendant]. So, that also played a part into [sic] the investigation." Defendant takes issue with the following colloquy that subsequently occurred:

> *Q*. You were advised not to have any—
>
> *A*. Contact with [defendant].
>
> *Q*. Was that—
>
> *A*. From a defense attorney.
>
> *Q*. From a defense attorney.
>
> *A*. Yes.
>
> *Q*. Did you ah, you did attempt to interview [defendant] again I believe?
>
> *A*. Yeah, but that—but that was when I was advised not to have any contact with him.

In *People v Schollaert*, 194 Mich App 158, 160-161; 486 NW2d 312 (1992), a police officer testified that when the police went to the defendant's house to take him in for questioning, defendant never asked why the police were there or made any statements aside from saying, " 'Come on in.' " This Court ruled that "the admission as substantive evidence of testimony concerning a defendant's silence before custodial interrogation and before the *Miranda*[8] warnings have been given is [not] a violation of the defendant's constitutional rights." *Id*. at 164. The *Schollaert* Court arrived at this conclusion after reviewing much of the very same caselaw that defendant relies upon on appeal. There is no indication that when Trooper Dougherty approached defendant for a follow-up interview, defendant was subject to a custodial interrogation and had been given the *Miranda* warnings. Under the ruling of *Schollaert*, there was no violation of defendant's right to remain silent.

In *Salinas v Texas*, 570 US 178, 181; 133 S Ct 2174; 186 L Ed 2d 376 (2013) (opinion by ALITO, J.), the United States Supreme Court addressed circumstances similar to those in *Schollaert*, regarding the introduction into evidence of a defendant's silence that occurred before placement into custody and before the giving of *Miranda* warnings. The Court had granted certiorari "to resolve a division of authority in the lower courts over whether the prosecution may use a defendant's assertion of the privilege against self-incrimination during a noncustodial police interview as part of its case in chief." *Id*. at 183. The lead opinion stated, "[B]ecause petitioner did not invoke the privilege during the interview, we find it unnecessary to reach that question." *Id*. The lead opinion stated that "it would have been a simple matter for [defendant] to say that he was not answering the officer's question on "Fifth Amendment grounds." *Id*. at 186. It indicated that for the defendant's argument on appeal to have been successful, the defendant must have

---

[8] *Miranda v Arizona*, 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966).

"expressly" invoked the privilege. See *id*. at 188. It stated that while reliance on the Fifth Amendment might be the most likely reason for a failure to answer police questions, there may be other reasons, such as an attempt to protect someone else. *Id*. at 189.[9]

The record here does not contain sufficient evidence that defendant was invoking his Fifth Amendment rights. There could have been other reasons why defendant's attorney advised defendant not to answer police questions, such as a fear of harassment. In light of *Schollaert* and *Salinas*, defendant has not established any Fifth Amendment error in connection with Trooper Dougherty's testimony.

To the extent that defendant is arguing that Trooper Dougherty's testimony somehow violated his right to counsel, this argument, too, is unsupported because the right to counsel does not attach until "after adversarial legal proceedings have been initiated against a defendant by way of indictment, information, formal charge, preliminary hearing, or arraignment[.]" *People v Hieu Van Hoang*, 328 Mich App 45, 55; 935 NW2d 396 (2019) (quotation marks and citation omitted). There is no indication that adversarial legal proceedings had been initiated at the time Trooper Dougherty approached defendant.

Defendant has not met his burden of showing a clear or obvious error and has not shown that counsel acted unreasonably with regard to Trooper Dougherty's testimony. *Carines*, 460 Mich at 763; *Ackley*, 497 Mich at 389.

## C. TESTIMONY BY THE TRIAL COURT

Defendant contends that the trial court improperly gave testimony at trial regarding (1) the lock on the bedroom door where CP slept on the night in question and (2) the way messaging works on Facebook.

### 1. LOCK COMMENT

Regarding the lock on the door of the bedroom where CP slept on the night in question, Trooper Dougherty stated, "We were informed that the door was a one-way lock and if I recall correctly, [the homeowners] said there's a little hole on the one side of the door that can pop the lock and open the door.[10] Lieutenant Sekely testified on direct examination that the lock was of a type that is opened with a key that is "almost like a pin, it's not much bigger than a paper clip. A . . . larger paper clip and yeah." The prosecutor asked whether the type of lock on the door could be unlocked with something other than a key. Lieutenant Sekely said, "Ah, yes. You could ah, straighten out a paper clip. You could use a small nail." Coltrane objected, stating that Lieutenant

---

[9] A majority of the justices in *Salinas* concurred that no Fifth Amendment violation had occurred. Two of the justices went further, however, and asserted that the defendant's "claim would fail even if he had invoked the privilege" because, in the view of those justices, the Fifth Amendment simply *does not prohibit* comments about a defendant's silence under any circumstances. *Id*. at 192-193 (opinion by THOMAS, J.).

[10] CP testified that the door had a "pin-hole" lock.

Sekely had not actually seen the lock. The court said, "I . . . agree." The prosecutor responded by saying that one of the homeowners, Lori Middleton, had told Lieutenant Sekely what "[t]ype of lock it was." The prosecutor asked, "Isn't that correct?" and Lieutenant Sekely answered, "That's correct." The prosecutor asked again if Middleton had told Lieutenant Sekely about the lock. Lieutenant Sekely said, "[W]hat I'm describing about the locks is what I was told by [Middleton]." The court said, "But we still don't have the lock, we don't have a picture of it." The prosecutor said, "No, we don't." The court said, "So, I . . . think it's been testified multiple times that a paper clip can trip this lock and a straight key can." Defendant objects to this last statement by the court.

Defendant has not established plain error in conjunction with the court's statement. Defendant frames the issue as involving a violation of the right to confrontation. Defendant argues that "he had no opportunity to question the judge to show that he . . . did not know anything about that lock." A defendant does have the right to confront witnesses against him or her. *People v Ho*, 231 Mich App 178, 189; 585 NW2d 357 (1998). "If a defendant has been limited in his ability to cross-examine the witnesses against him, his constitutional right to confront witnesses may have been violated." *Id*. But the trial court was not a "witness against defendant" when it made the comment about the lock. The court stated that "*it's been testified* multiple times that a paper clip can trip this lock and a straight key can." (Emphasis added.) Trooper Dougherty testified about the "hole" by which one could "pop the lock and open the door." Lieutenant Sekely said that a paper clip or a small nail or a key that was like "a larger paper clip" could open the lock. The court was summarizing the testimony that had already been given—not giving testimony itself. Under these circumstances, there was no clear or obvious violation of defendant's right to confrontation. See *Carines*, 460 Mich at 763. With regard to the claim of ineffective assistance of counsel, even assuming, for purposes of argument, that Coltrane should have objected to the court's comment, defendant has not established the requisite prejudice. Indeed, the testimony by Trooper Dougherty and Lieutenant Sekely conveyed the same information, and the court's statement adequately conveyed that it was simply referring to earlier testimony. There is no reasonable probability that the court's comment affected the outcome of the case. *Ackley*, 497 at 389. Although defendant claims that he had no opportunity to set forth the fact that "the judge . . . did not know anything about that lock," this was patently evident from the context and content of the court's comment.[11]

## 2. FACEBOOK COMMENT

The Facebook comment arose after CP testified that she received a Facebook message from defendant around 4:00 a.m. on the night in question. A juror posed a question, asking whether defendant needed CP's cellular-telephone number to send her a Facebook message. CP said that

---

[11] In his supplemental brief on appeal, defendant contends that it was "not reasonable for the judge even to allow testimony about the properties of a lock from witnesses who had never seen the lock." Defendant does not support this statement with any authority and, at any rate, we find that it is an improper attempt to expand the issue as presented before remand. See *People v Brigham*, unpublished order of the Court of Appeals, entered February 8, 2019 (Docket No. 342621) (noting that the remand proceedings and the supplemental brief were limited to the issues raised in the motion to remand). Defendant's focus before remand was that the *court* gave improper testimony and that Coltrane had not been given an opportunity to cross-examine the court.

he did not. The court said, "With Facebook it's a completely different system, if you're on Facebook and he's on Facebook he can message you. Although if you're not friends you wouldn't get that message until you friended him." CP then said, "Right." She said, "Cuz . . . I was friends with [Middleton] on Facebook so I would have been on her friends list [for defendant] to find me there." She said, "And then he can send me a message but I, it doesn't give you an alert. It's still in my Facebook inbox thing where I can accept it or I can decline the message—" The prosecutor said, "[F]or someone who might not be clear on Facebook . . . you don't have to be friends to message somebody[?]" CP replied, "No, but that's when you don't get the alert that there's a message so, for friends on Facebook and you message me I'll get an alert that I have a message." She indicated that the message would be "in my Facebook inbox thing where I can accept it or I can decline the message. . . ."

Defendant states on appeal, "As for Facebook, the judge, even if he knew the ins and outs of that website as of the time in question, the information still must come from a witness, not from a judge who cannot be cross-examined, and whose word will be taken as the truth." It appears that there *was* in fact a clear or obvious error, see *Carines*, 460 Mich at 763, with regard to the court's statement about Facebook, and indeed the court appears to have admitted as much in post-trial proceedings. The court appears to have been giving a statement of alleged fact about Facebook. However, defendant has not shown that this error was outcome-determinative. The court stated that a person who is on Facebook can message a second person who is on Facebook, although the second person would not "get that message" until he or she "friended" the first person. If anything, the court's comment aided the defense, because it suggested that CP could not have read the message from defendant unless she "friended" him. CP testified that she did not read the message until a day or two after the incident; her having "friended" defendant a day or two after the charged incident would have been detrimental to the prosecutor's case.

Defendant has not established entitlement to relief under the plain-error doctrine and cannot show a reasonable probability, in conjunction with his ineffective-assistance claim, that the outcome of the case would have differed had he objected to the court's comment about Facebook. *Id.*; *Ackley*, 497 at 389.

## II. DEFENDANT'S RIGHT TO TESTIFY

Defendant contends that reversal is mandated because the record contains no on-the-record waiver, by him as opposed to Coltrane, of his right to testify. Whether a defendant's waiver of the right to testify must occur on the record is an issue of law. We review issues of law de novo. *People v Aspy*, 292 Mich App 36, 40; 808 NW2d 569 (2011).

A defendant has a constitutional right to testify, and although defense counsel must advise the defendant of this right, it is ultimately the defendant's decision regarding whether to testify. *People v Bonilla-Machado*, 489 Mich 412, 419; 803 NW2d 217 (2011). But "[t]here is no requirement in Michigan that there be an on-the-record waiver of a defendant's right to testify." *People v Harris*, 190 Mich App 652, 661; 476 NW2d 767 (1991). In *Harris*, *id*. at 661-662, the Court stated that "the trial court had no duty to advise [the defendant] of the right [to testify], nor

was it required to determine whether she made a knowing and intelligent waiver."[12]  *Harris* is dispositive with regard to defendant's claim that error occurred by virtue of the fact that the trial record shows no explicit waiver of his right to testify.

Defendant also contends that Coltrane rendered ineffective assistance of counsel by failing to adequately advise him of the right to testify.  This argument, too, is not tenable.  A defendant has the burden of establishing the factual predicate for a claim of ineffective assistance of counsel.  *People v Hoag*, 460 Mich 1, 6; 594 NW2d 57 (1999).  Defendant said at the *Ginther* hearing that he did not "know that [he] had really a say" regarding whether to testify.  Defendant's statement is belied by the trial record, however.  During jury selection, in the presence of defendant, Coltrane asked the potential jurors, "Would you guys promise to me that one way or the other, we won't know but will you guys promise me that you won't judge [defendant] if . . . he decides not to testify?  If we decide together?"  Coltrane then said, "That's his constitution [sic] right."  As noted, Coltrane referred to defendant "decid[ing] not to testify."  In addition, defendant's father said in a sentencing letter, "My son should have testified but unfortunately all the advice that we were given was it wasn't necessary based on the evidence."  In his closing argument, Coltrane stated that "we made" the decision to have defendant refrain from testifying and asked the jurors to refrain from holding this against defendant.  Coltrane denied at the *Ginther* hearing that it was solely his (i.e., Coltrane's) decision that defendant not testify.  The record supports that defendant did, in fact, know that he had a "say" in whether to testify.

Defendant also argues that Coltrane rendered ineffective assistance by *advising* defendant not to testify because defendant's testimony was necessary for the consent defense.  As delineated in part I.A.1. of this opinion, Coltrane brought up the consent defense in other ways.  In addition, Coltrane stated at the *Ginther* hearing that "[t]here were things that we didn't want to go into . . . that we thought would hurt our position."  Given that defendant, if he testified, would have been subject to a withering cross-examination in connection with his police interview, this statement by Coltrane carries weight.  Defendant has not overcome the strong presumption of sound trial strategy.  *Ackley*, 497 Mich at 388.

## III.  HEARSAY

Defendant contends that testimony by witness Mark Lamse was inadmissible hearsay.  This Court reviews for an abuse of discretion a trial court's decision regarding the admission of evidence.  *People v Denson*, 500 Mich 385, 396; 902 NW2d 306 (2017).

Lamse testified that CP texted him on the evening in question and "kinda ah, eluded [sic] to the fact that you know, someone was kinda giving her the creeps or she was glad she had a lock on the door or something to that nature."  The prosecutor said, "And you indicated that she did mention that somebody was being kinda creepy[?]" Lamse responded, "Yeah."  Defendant objects

---

[12] Contrary to defendant's argument, *Halbert v Michigan*, 545 US 605; 125 S Ct 2582; 162 L Ed 2d 552 (2005), does not contradict Michigan caselaw indicating that the waiver of the right to testify need not be shown on the record.

-10-

to the admission of Lamse's testimony and claims that it amounted to using CP's out-of-court statement to prove that defendant was acting "creepy."

MRE 803(3) states that the following is not excluded by the hearsay rule:

> A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will.

In *People v Ortiz*, 249 Mich App 297, 300; 642 NW2d 417 (2001), the defendant was convicted of murdering his ex-wife. The trial court admitted several statements of the victim into evidence under MRE 803(3), including statements "that the victim was afraid of [the] defendant, [and] that she thought [the] defendant was stalking her." *Id*. at 307. This Court upheld admission of the statements, ruling, in part, that "[e]vidence of the victim's state of mind, [and] evidence of the victim's plans, which demonstrated motive (the ending of the marriage and the tension between the victim and the defendant), . . . were admissible under MRE 803(3)." *Id*. at 310. The situation in *Ortiz* is somewhat analogous to the present case, because Lamse was, in effect, testifying about CP's discomfort as a result of the behavior of a person at the party.

Defendant, however, relies on *People v Moorer*, 262 Mich App 64; 683 NW2d 736 (2004). In that case, the defendant was convicted of killing the person who was dating his estranged wife. *Id*. at 65. "The trial court permitted several witnesses to . . . testify that [the victim] told them that [the] defendant had threatened [the victim's] life." *Id*. at 66-67. A witness also stated that the victim told him that defendant "was looking for [the victim] with a pistol[.]" *Id*. The defendant conceded that "the challenged statements in part concerned [the victim's] state of mind," but argued "that they also . . . described actions by [the] defendant" and thus did not fall within the parameters of MRE 803(3). *Id*. at 72. The *Moorer* Court ruled that the analysis in *Ortiz* was "cursory" and provided "no reliable basis for the admission of the alleged hearsay statements at issue in" *Moorer*. *Id*. at 72. The *Moorer* Court ruled that the statements at issue were not admissible because they were "statements of mind . . . based on past events[.]" *Id*. at 73. It emphasized that out-of-court statements involving past events could not be used to prove the past events. *Id*. at 73-74.

In some ways, the present case is similar to *Moorer*, because when CP told Lamse that she felt uncomfortable because of someone being "creepy," this was, viewed in context, a statement that defendant, before CP's statement to Lamse—i.e., in the past—had been acting in a certain manner—i.e., in a "creepy" manner. It could be argued that the prosecutor, by having Lamse testify, was trying to prove the past event (involving defendant acting strangely). In other ways, however, the present case is dissimilar to *Moorer*, because the primary point of the prosecutor's introduction of the statement was to show that CP was *feeling* a certain way and that, in light of this feeling, she would not have voluntarily had sex with defendant. Cf. *People v Smelley*, 285 Mich App 314, 325-326; 775 NW2d 350 (2009), vacated in part on other grounds 485 Mich 1023 (2010) (indicating that the out-of-court statements in that case were admitted primarily for demonstrating the truth of certain acts committed by the defendant, not for demonstrating the declarant's state of mind).

We conclude that we need not decide whether Lamse's testimony was admissible under *Ortiz* or inadmissible under *Moorer*, because "evidentiary error does not require reversal unless, after an examination of the entire cause, it appears more probable than not that the error affected the outcome of the trial in light of the weight of the properly admitted evidence." *Id*. at 327. Defendant concedes that a witness can testify that a speaker was upset during a conversation. As such, Lamse could properly testify about CP's discomfort *in general*. The only objectionable part of Lamse's testimony was that CP attributed this feeling to the actions of a person at the party.[13] But CP *herself* clearly and repeatedly testified that it was *defendant's actions* that made her feel uncomfortable. In fact, she referred to the texting conversation with Lamse, saying, "I had messaged [Lamse] because at one point I felt very uncomfortable so I went up to [Middleton] and I said what's up with [defendant], he's kinda freaking me out." Defendant did not challenge this testimony below and does not challenge it on appeal. Given that CP testified to the same information now being challenged on appeal and given that Lamse could properly testify about CP's discomfort in general, it is not "more probable than not" that any error associated with Lamse's testimony affected the outcome of the case. *Id*.[14]

## IV. ADDITIONAL ALLEGATIONS OF INEFFECTIVE ASSISTANCE

Defendant raises four additional areas in which he believes that Coltrane rendered ineffective assistance of counsel. He claims that Coltrane was ineffective by dealing with the laboratory reports in an unreasonable manner, by failing to object to the admission of sexual-assault-nurse-examiner (SANE) evidence, by failing to object to improper arguments by the prosecutor, and by failing to dismiss a juror during jury selection.

## A. LABORATORY REPORTS

There were two laboratory reports introduced at trial: the initial report of preliminary testing by Tara Lang Cramer, who testified at trial, and the report of DNA testing by Michelle

---

[13] While it is true that Lamse did not refer to defendant by name in his testimony, it is clear from context that CP, in her statement to Lamse about which Lamse was testifying, was referring to defendant.

[14] Defendant appears to be contending that Coltrane rendered ineffective assistance of counsel by not objecting to Lamse's testimony on the basis of MRE 402 and MRE 403. He states that "[t]he state of mind of the complainant was not relevant" and that the testimony "was more prejudicial than probative." This argument is without merit. CP's state of mind *was* relevant and in fact it was highly relevant. That CP felt uncomfortable on the evening in question made it less likely that she consented to having sex with a person she had just met. Coltrane's failure to object on the basis of MRE 402 and MRE 403 did not fall below an objective standard of reasonableness. *Ackley*, 497 Mich at 389. Moreover, the failure to object was not reasonably likely to have affected the outcome of the case, *id*., because (1) the objection would likely have been overruled and (2) even if Lamse's testimony had been excluded, CP testified to the same information.

-12-

Schmitt, who did not testify at trial. Defendant contends that Coltrane should not have acquiesced to the admission of the DNA report into evidence.

Smith asked at the *Ginther* hearing about the admission of the DNA report without the testimony of Schmitt. Coltrane said that the laboratory reports were not the "crux of the case" because the defense was consent. He said, "[W]e're not saying that there was not any type of sexual activity whatsoever." Smith asked why, then, he cross-examined so much about the report,[15] and Coltrane said:

> [A]t that point in time it was one of those things where it was something that was latched [onto] based upon what happened at trial, and it was just basically casting doubt, another issue of reasonable doubt. You know, it wasn't, you know, like I said, everything in hindsight's 2020 [sic]. Where you're in the middle of trial and there's another issue that could possibly cause reasonable doubt, it was . . . something that I looked into further.

Coltrane said, "[I]t was casting a little bit of doubt on those as another area of possible reasonable doubt." But he said that he did not want to argue forcefully that the laboratory reports were wrong because the primary defense was consent, and he said that he believed that having an expert weigh in on the probability statistics "would've been extremely confusing for the jury." Coltrane said that, in essence, the defense was not "disputing" the test results, even though he did try to seed some doubt in the jury about the results.

The court ruled that "[t]he DNA was not pivotal" for the defense because the defense was consent. It said that counsel was trying to "cast a little bit of confusion over the DNA test results, but it really wasn't a pivotal point in this case because it was consensual sex so his DNA would likely be there. That was basically his case from my point of view listening to his opening, listening to his closing, and watching the way he approached the issues on direct and cross-examination."

Defendant contends that Coltrane, by acquiescing to the admission of the DNA report, foreclosed the opportunity to exclude the evidence entirely (i.e., if the prosecutor did not produce Schmitt as a witness). See, generally, *Melendez-Diaz v Massachusetts*, 557 US 305; 129 S Ct 2527; 174 L Ed 2d 314 (2009) (dealing with the right to confrontation in the context of laboratory reports). But defendant has pointed to no evidence that Schmitt was unavailable as a witness. A defendant bears the burden of establishing the factual predicate for his or her claim of ineffective assistance of counsel, and defendant has not met this burden. See *People v Jackson (On Reconsideration)*, 313 Mich App 409, 432; 884 NW2d 297 (2015). In other words, he has not provided any basis for this Court to conclude that if Coltrane had insisted on the DNA report being

---

[15] We disagree that Coltrane cross-examined witnesses *strenuously* about the DNA report authored by Schmitt, although he did refer to the DNA test as being a "probability test." He did ask *Cramer* some probing questions about *her* preliminary report. We note that the fact that Coltrane made reference to the "probability test" belies defendant's implication on appeal that Coltrane did not understand the DNA report.

admitted only in conjunction with the testimony of Schmitt, the report would have been excluded because of Schmitt's unavailability.

Defendant also claims that Coltrane should have questioned Schmitt about the meaning of the report to show that the DNA results were not particularly reliable and not particularly strong in terms of implicating defendant. Again, however, defendant points to nothing showing that a cross-examination of Schmitt, in particular, would have weakened the impact of the report. *Id*. For example, defendant did not present a scientific expert at the *Ginther* hearing to opine that the DNA results were untrustworthy or otherwise suspect. The DNA report stated that a "Y-STR haplotype" was obtained from defendant's known DNA. It stated that the "Y-STR haplotype" identified in CP's underwear "matches the Y-STR haplotype from" defendant and "would be expected to match all other paternally related males." The report indicated that it was 2141 times more likely that defendant was the source of the haplotype in the underwear than an unrelated male in the Caucasian population, 1220 times more likely that defendant was the source of the haplotype in the underwear than an unrelated male in the African American population, and 1443 times more likely that defendant was the source of the haplotype than an unrelated male in the Hispanic population.

Admittedly, Coltrane could have elicited the fact that this case did not involve a rock-solid identification of unique DNA, such as one finds in some other cases, but instead involved certain *probabilities* of finding a particular Y-STR haplotype in certain populations. But Coltrane did not need Schmitt, in particular, to do this, because it was apparent from reading the report itself, which was admitted into evidence in conjunction with police testimony.

What could be deemed problematic is that Coltrane allowed Trooper Dougherty to testify that "the DNA came back either it was from [defendant] or a paternal relative of [defendant]."[16] This was a mischaracterization of the DNA results.[17] It is true that the jurors could read the report themselves, but given its technical wording, it is not unreasonable to assume that some jurors may have relied on Trooper Dougherty's characterization of the results in the report. *If* the defense was primarily arguing that sex between defendant and CP never happened, it would have fallen below

---

[16] Trooper Dougherty's and Lieutenant Sekely's testimony about a "match" between the underwear DNA and defendant's DNA was less troublesome because the Y-STR haplotype was, in fact, a match. The problem is that there were *other potential people* who could have been "matches." That, indeed, was the point of the probability analysis in the DNA report.

[17] Trooper Dougherty erred again when he said that semen was found in CP's underwear. Indeed, the pertinent report refers only to "the possible presence of seminal fluid." There is no reasonable probability that this error affected the outcome of the trial, however, see *Ackley*, 497 Mich at 389, because (1) the jurors could see the word "possible" clearly on the first page of the pertinent report; Lieutenant Sekely properly referred to the "*possible* presence of seminal fluid" (emphasis added); and, most importantly, the author of the report, Cramer, testified, "I was able to identify the possible presence of seminal fluid um, but I wasn't able to confirm necessarily that there was semen present."

an objective standard of reasonableness for Coltrane to refrain from objecting to this mischaracterization by Trooper Dougherty, because the officer made the DNA results seem much stronger than they actually were.

A pertinent question, then, is whether the trial court was correct in its conclusion that "[t]he DNA was not pivotal" for the defense because the defense was consent. As set forth in part I.A.1. of this opinion, the primary defense was, indeed, consent. It is true that at the *Ginther* hearing, Coltrane said that he did try to seed some doubt in the jury about the meaning of the testing results. Coltrane's testimony from the *Ginther* hearing, along with the somewhat different tones of his closing statement and his opening statement,[18] indicate that Coltrane was touching upon whether the sex between CP and defendant had even occurred. This was likely because of the jurors' questions during trial whereby they inquired about where exactly the DNA was found on CP's underwear and also inquired about whether defendant had ever slept in the bed where the sexual assault was alleged to have taken place. But the fact remains that the primary defense was consent. As noted, Coltrane said that he did not want to argue forcefully that the laboratory reports were wrong because the primary defense was consent, and he said that he believed that having an expert weigh in on the probability statistics "would've been extremely confusing for the jury."

Even though the DNA results gave "probabilities," the fact remains that these probabilities were extremely damaging in light of CP's testimony and in light of the undisputed facts that defendant slept in the same house as CP that night, without any of his male relatives being present. In addition, defendant's 4 a.m. Facebook message to CP was entered into evidence. Conceding sex and arguing consent or lack of force was a reasonable choice of strategy. We conclude that Coltrane's failure to object to Trooper Dougherty's mischaracterization of the DNA testing results was not unreasonable because Coltrane was relying primarily on the defense of consent, even though, during the course of trial, he tried to plant a small seed of doubt regarding whether the sex ever happened.

## B.  SANE EVIDENCE

The SANE nurse who examined CP after the incident testified at trial, and her report was entered into evidence.

MRE 803(4) states that the following are not excluded by the hearsay rule:

> Statements made for purposes of medical treatment or medical diagnosis in connection with treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof as reasonably necessary to such diagnosis and treatment.

In *People v Mahone*, 294 Mich App 208, 214-215; 816 NW2d 436 (2011), this Court stated that "[s]tatements made for the purpose of medical treatment are admissible pursuant to MRE 803(4) if they were reasonably necessary for diagnosis and treatment if the declarant had a self-interested motivation to be truthful in order to receive proper medical care." The Court added, "This is true

---

[18] He emphasized consent more in the latter.

irrespective of whether the declarant sustained any immediately apparent physical injury." *Id*. at 215. Significantly, the Court stated:

> Particularly in cases of sexual assault, in which the injuries may be latent, such as contracting sexually transmitted diseases or psychological in nature, and thus not necessarily physically manifested at all, *a victim's complete history and a recitation of the totality of the circumstances of the assault* are properly considered to be statements made for medical treatment. Thus, statements the victim made to the nurse were all properly admissible pursuant to MRE 803(4). [*Id*. (citation omitted; emphasis added).]

In light of *Mahone*, the nurse's testimony and report were admissible. And counsel was not required to make a futile objection. *People v Ericksen*, 288 Mich App 192, 201; 793 NW2d 120 (2010).

Defendant contends that certain Supreme Court precedent shows that the nurse's report and testimony were inadmissible. For example, he cites *People v LaLone*, 432 Mich 103, 109, 113-116; 437 NW2d 611 (1989) (opinion by BRICKLEY, J.),[19] wherein the Court concluded that a statement to a psychologist about the identify of an attacker in a sexual-assault case was not admissible under MRE 803(4). But even assuming that the holding of *LaLone* extends to a statement made to a SANE nurse, there still would be no ineffective assistance of counsel in the present case because CP clearly named *defendant* as the attacker during her testimony and there was never any allegation that the crime occurred but was committed by someone other than defendant. As such, any possible error associated with the nurse's reporting of defendant's name was not reasonably likely to have affected the outcome of the case. *Ackley*, 497 Mich at 389.

Defendant also relies on *Merrow v Bofferding*, 458 Mich 617; 581 NW2d 696 (1998). In that case, the plaintiff alleged negligence after he sustained arm injuries from a glass door pane located in a residence leased from the defendants. *Id*. at 620. The defendants alleged that the plaintiff caused his own injury by punching the glass. *Id*. at 621. They sought to introduce an excerpt from the plaintiff's medical records stating that the plaintiff put his arm through the glass after being involved in a fight with his girlfriend. *Id*. The Court ruled that "the statement concerning the 'fight with his girlfriend' " was improperly admitted under MRE 803(4) because all the doctor needed to know for diagnosis and treatment was that defendant's arm went through the glass, not that defendant had a fight with his girlfriend. *Id*. at 628-630. The Court noted that the plaintiff had specifically sought treatment for injuries to his arm and that what happened *before* the arm went through the window was not necessary for diagnosis and treatment. *Id*. at 630 & n 10. The present case is different because clearly, possible psychological injuries were at issue. See *Mahone*, 294 Mich App at 215. In fact, CP reported to the nurse that she was having a hard time processing what happened, and the nurse noted that CP was "very much self-blaming." Defendant's reliance on *Merrow* is unpersuasive.

---

[19] A majority of the justices concurred in the proposition from *LaLone* that is cited here.

## C. PROSECUTORIAL ERROR

Defendant contends that Coltrane was ineffective because he failed to object to certain analogies made by the prosecutor during voir dire and during her rebuttal closing argument. A prosecutor does not have to confine his or her argument to the blandest possible terms. *People v Aldrich*, 246 Mich App 101, 112; 631 NW2d 67 (2001). The pertinent question is whether the prosecutor's remarks, viewed in context, tended to deprive defendant of a fair and impartial trial. See *id*. at 110. We conclude that Coltrane did not act below an objective standard of reasonableness by failing to object to the prosecutor's comments because the prosecutor, in making her analogies, was merely trying to convey the meaning of the difficult-to-define concept of "beyond a reasonable doubt." In addition, there was no reasonable probability that the failure to object affected the outcome of the proceedings. *Ackley*, 497 Mich at 389. The court stated in its preliminary jury instructions that defendant was presumed innocent and that this presumption was to continue "unless you are satisfied beyond a reasonable doubt that [defendant] is guilty." It described a reasonable doubt as "a fair, honest doubt growing out of the evidence or lack of evidence." The court said, "It is not merely an imaginary or possible doubt, but a doubt based on reason and common sense. A reasonable doubt is just that, a doubt that is reasonable after a careful and considered examination of the facts and circumstances of this case." The court repeated this information in its final instructions. It also stated, "[Y]ou must take the law as I give it to you. If a lawyer says something different about the law, follow what I say." Jurors are presumed to follow their instructions. *Mahone*, 294 Mich App at 212. Under the circumstances, defendant has not established ineffective assistance of counsel in connection with the prosecutor's comments.

## D. JURY SELECTION

Defendant contends that Coltrane was ineffective because he failed to use an available peremptory challenge to dismiss a juror—Juror McPherson—who was a conservation officer and worked with Trooper Dougherty.

At the *Ginther* hearing, Coltrane said that he remembered Juror McPherson and remembered that he had been the jury foreperson. Smith asked how Coltrane thought Juror McPherson would be helpful to the defense. Coltrane answered:

> [H]e said he could . . . be impartial, but you and I both know that you could take that one way or the other. But he knew police procedures. He's dealt with individuals that lie, tell, you know, falsities on a regular basis.
>
> As far as, you know testimony of [CP] is concerned what we saw were multiple opposing statements, contradictory statements that I thought he would pick up on.
>
> Also, there were some problems with the actual—with the detectives not going back to the scene, doing that kind of stuff, whereas I thought if he could be impartial, he would be a strong individual, I thought after questioning him, and I believe I went back and actually questioned him a few times or asked him additional questions, I thought that he would see all of that.

And I thought that he would be an individual, especially, you know as . . . an officer to strictly abide by the law as, you know, as it's concerned that it's beyond a reasonable doubt and with . . . his knowledge, I . . . thought it would play to our advantage.

Smith asked whether it would be fair to assume that a law-enforcement officer would put trust into what another officer said in a case, and Coltrane answered:

Not necessarily. That's the answers that I received from Officer McPherson. They let [sic] me to believe that he could be impartial, and that's why I left him on there, basically. Because he knew the policies and procedures, knew how everything was supposed to be done, and it was not done correctly. So I don't necessarily think it would be 100-percent accurate to say that.

Coltrane said, "I thought . . . he was gonna be impartial." He added, "I thought given . . . the things that happened throughout the . . . investigation, things that weren't done, that weren't done correctly, you know, different statements made, contradicting statements I thought was stuff he deals with every day that he'd be able to pick up on." Coltrane said that he thought that Juror McPherson "could aid in our defense." He also indicated that he and defendant decided together to keep Juror McPherson on the jury, agreeing with prosecutor that he had turned and spoken with defendant before deciding to keep Juror McPherson.

There is a strong presumption that trial counsel's actions were strategic. *People v Unger*, 278 Mich App 210, 342; 749 NW2d 272 (2008). This Court does "not substitute [its] judgment for that of counsel on matters of trial strategy" and does not "use the benefit of hindsight when assessing counsel's competence." *Id*. at 242-243. The *Unger* Court stated, "Perhaps the most important criteria in selecting a jury include a potential juror's facial expressions, body language, and manner of answering questions." *Id*. at 258. It added, "[A]s a reviewing court, we cannot see the jurors or listen to their answers to voir dire questions. For this reason, this Court has been disinclined to find ineffective assistance of counsel on the basis of an attorney's failure to challenge a juror." *Id*. at 258 (quotation marks and citation omitted). The Court noted that "[a] lawyer's hunches, based on his observations, may be as valid as any method of choosing a jury." *Id*. (quotation marks and citation omitted).

It is apparent from Coltrane's questioning during voir dire, as well as from his testimony at the *Ginther* hearing, that he carefully weighed whether to keep Juror McPherson on the jury and decided to do so as a matter of strategy. However, this Court cannot insulate a review of an attorney's performance merely by calling it trial strategy; the strategy must be sound. *Ackley*, 497 Mich 388-389. Although some of Juror McPherson's answers during voir dire could be viewed as favorable to the prosecution, Juror McPherson stated that he could weigh the evidence equally and be fair and impartial. He also placed a certain emphasis on going to the scene when investigating a crime. And part of Coltrane's strategy was to argue that the police conducted a shoddy investigation, such as by not going to the crime scene or investigating the doors in the house. Given this strategy, and given the *Unger* Court's emphasis on nonverbal cues, we conclude that defendant has not overcome the presumption of sound trial strategy. As noted by the prosecutor on appeal, Juror McPherson may have "given some nonverbal cue that he disliked Trooper Dougherty."

As for the prejudice prong of an ineffective-assistance claim, defendant claims that a defendant need not establish prejudice from any errors in jury selection because such prejudice is nearly impossible to demonstrate. Defendant relies on *People v Schmitz*, 231 Mich App 521; 586 NW2d 766 (1998), abrogated by *People v Bell*, 473 Mich 275; 702 NW2d 128 (2005), amended 474 Mich 1201 (2005), a case involving an improper denial by the trial court of peremptory challenges. In particular, defendant relies on the *Schmitz* Court's indication that "prejudice from errors surrounding the selection of juries is virtually impossible to demonstrate" and its resultant conclusion that a defendant, to obtain relief, need not establish prejudice resulting from such errors. See *id*. at 531-532. In *Bell*, 473 Mich at 293 (opinion by CORRIGAN, J.), it was indicated that an improper denial by a trial court of peremptory challenges *is* subject to harmless-error analysis. The lead opinion stated that *Schmitz* is "no longer binding, in light of our current harmless error jurisprudence, to the extent that [it holds] that a violation of the right to a peremptory challenge requires automatic reversal." *Id*. at 293.[20] The lead opinion stated that it is jury-selection errors involving racial discrimination that are not subject to harmless-error analysis. *Id*. at 293.

Defendant's reliance on *Schmitz* for his argument that no prejudice need be demonstrated in the present case is improper in light of the statements in *Bell*. The Court in *Bell* evidently did not agree with *Schmitz* that the difficultly in demonstrating prejudice from jury-selection errors should always obviate prejudice requirements. As such, defendant has not demonstrated that the standard "prejudice" prong for an ineffective-assistance claim is inapplicable to the current issue. Given Juror McPherson's assertion that he could weigh the evidence fairly, defendant has not shown a reasonable probability that Coltrane's failure to dismiss Juror McPherson affected the outcome of the trial, *Ackley*, 497 Mich 389, even *if* the decision fell below an objective standard of reasonableness.

## V. CUMULATIVE ERROR

Defendant argues that reversal is required because of cumulative error. "This Court reviews a cumulative-error argument to determine if the combination of alleged errors denied the defendant a fair trial." *People v Hill*, 257 Mich App 126, 152; 667 NW2d 78 (2003).

"[T]he cumulative effect of several errors can constitute sufficient prejudice to warrant reversal where the prejudice of any one error would not." *LeBlanc*, 465 Mich at 591.

As set forth earlier in this opinion, the areas of error involved (1) Trooper Dougherty's statement about seeing deception in defendant's interview and the prosecutor's related question to Lieutenant Sekely during which she referred to defendant's deception;[21] (2) the court's

---

[20] A majority of justices agreed that the denial of a statutory peremptory challenge is subject to harmless-error review and that *Schmitz* was, therefore, repudiated. See *Bell*, *id*. at 302 (opinion by TAYLOR, C.J.).

[21] As we have noted, the statement by Trooper Dougherty *during the interview* about the believability of CP's story could not conceivably be prejudicial, given his testimony that he

-19-

"testimony" about Facebook; and (3) arguably, Lamse's reference to CP's statement about a person acting "creepy." The court's testimony about Facebook was *favorable* to the defense, as we noted in part I.C.2. of this opinion. In addition, Lamse's reference to CP's statement about a person acting "creepy" was inconsequential, given that (1) Lamse could *properly* comment regarding CP's state of mind in general and (2) CP clearly testified that it was the actions of *defendant* that were making her feel uncomfortable that night. The only error of possible consequence involved the issue of defendant's credibility during his police interview.[22] But as we have already discussed, the "deception" errors were not outcome-determinative, and it was not unreasonable for Coltrane to fail to object to the testimony and comments in question.

Defendant reiterates his contention that the trial court applied the wrong standard of review for claims of ineffective assistance of counsel. The court stated that the jury would not "have come to a different conclusion" even if various alleged errors had not occurred. But just because the court did not set forth, with exact precision, the "reasonable probability" language from caselaw dealing with ineffective assistance of counsel, see, e.g., *Ackley*, 497 Mich at 389, does not mean that the court applied the improper standard. At any rate, while this Court reviews a trial court's *factual findings* for clear error, it reviews *de novo* the ultimate question of whether a person has been denied his or her constitutional right to effective assistance of counsel. *LeBlanc*, 465 Mich at 579. As such, the trial court's wording is of little consequence. No basis for reversal is apparent.

## VI. CONCLUDING REMARKS

Defendant strenuously argues that Coltrane rendered ineffective assistance of counsel. He contends that he would have been better served if Coltrane had more aggressively pursued a strategy of consent by putting defendant on the stand. But as we noted, Coltrane had legitimate concerns about how defendant would fare on the stand. Conversely, a possible strategy might have been to focus on the laboratory reports and argue forcefully that the prosecutor had failed to establish beyond a reasonable doubt that the Y-STR haplotype found in CP's underwear belonged to defendant. This strategy was questionable, however, given CP's testimony at trial. And again, defendant told Coltrane from the outset that he *did* have sex with CP, thus precluding the possibility of Coltrane's putting defendant on the stand to *deny* sexual contact. Ultimately, Coltrane primarily presented a defense of consent and also attempted to plant a small seed of doubt regarding whether any sex had even occurred. As noted, this slight change in strategy occurred mid-trial and was likely the result of questions posed by jurors. Coltrane's cross-examination of CP was extremely thorough and he repeatedly tried to suggest to the jurors that the police investigation had been shoddy. His voir dire questions were probing, and his opening and closing statements were lengthy. As stated in *LeBlanc*, 465 Mich at 592:

---

believed *defendant* at the conclusion of the interview. Viewed in context, the statement by Trooper Dougherty was simply an interview technique.

[22] As discussed in part IV.A. of this opinion, the way Coltrane dealt with the DNA evidence was not "erroneous" because it was reasonable trial strategy; he was primarily focusing on consent and did not want to confuse the jury by delving into the probability statistics surrounding the DNA.

In the real world, defending criminal cases is not for the faint of heart. Lawyers must fulfill ethical obligations to the court, zealously advocate the client's best interests (which includes establishing that they, and not the client, are in charge of making the professional decisions), and protect themselves against grievances and claims of malpractice. Lawyers will inevitably make errors in the process, but, because both cases and attorneys come in an infinite variety of configurations, those errors can only rarely be defined with sufficient precision to inform defense attorneys correctly just what conduct to avoid. Thus, the Sixth Amendment guarantees a range of reasonably competent advice and a reliable result. It does not guarantee infallible counsel. [Quotation marks and citations omitted.]

We conclude that Coltrane was reasonably competent and that the result of the trial was reliable.

Affirmed.

/s/ Karen M. Fort Hood
/s/ Jane M. Beckering
/s/ Mark T. Boonstra